**MAGNOLIA PETROLEUM COMPANY**
and
**Jocharanne Tugboat Corporation**
v.
**TUG JARED, Her Engines, Tackle, Apparel, etc.**

**No. 3457.**

United States District Court
E. D. Louisiana,
New Orleans Division.

April 8, 1963.

J. Barbee Winston, Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, La., for libelants.

George Matthews and George A. Frilot, Jr., Lemle & Kelleher, New Orleans, La., for respondents.

CHRISTENBERRY, Chief Judge.

This action was brought by Magnolia Petroleum Company, as owner, and Jocharanne Tugboat Corporation, as purchaser, of the M/V J. L. LATIMER against the Tug JARED to recover damages allegedly sustained by the LATIMER while in tow of the JARED. The case was tried in open Court and was thereafter extensively briefed by the parties, and the Court, having considered the evidence and the briefs of the parties, now makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

### I.

At the times hereinafter mentioned Magnolia Petroleum Company was a Texas corporation and was the owner of the J. L. LATIMER, a steam motor tanker, 260 ft. in length by 40 ft. in breadth. Magnolia had contracted to sell the LATIMER to Jocharanne Tugboat Corporation, a New York corporation, and Jocharanne in fact became the owner of the LATIMER on December 20, 1956. The contract of sale was a written document and it provided for the risk of loss of the vessel. However, in view of the Court's findings and conclusions this issue is immaterial.

### II.

At the times in question the tug JARED was owned by Jules Vidos, who died prior to the trial. His widow, Martha G. Vidos, d/b/a Vidos Towing Company, filed a claim for the vessel and an answer denying liability. The Tug JARED is a model bow, steel hull tug with adequate horsepower to handle the LATIMER in tow. At the times involved here she was properly crewed with a complement of efficient personnel.

### III.

The LATIMER had been acquired by Magnolia in early 1954. Certain repairs had been performed thereafter and the vessel was put in service. Further repairs were performed in 1955 following storm damage and the vessel continued in service until about October 14, 1955, when it was laid up and moored to an island in the Sabine River. The LATIMER remained there until February of 1956 when for some unexplained reason it was moved in tow as a dead ship to Dupuis Shipyard on Bayou Teche above Morgan City, Louisiana. The LATIMER left Orange, Texas in tow of the Tug CAPTAIN CHRIS HARMS on February 29, 1956, and arrived in Morgan City on March 2, 1956. It remained there until March 4, 1956, when it was towed by the Tug D. A. LITTLE to Dupuis Shipyard where it arrived on March 5, 1956. At the shipyard approximately 15 ft. of the bow of the vessel was shoved onto the bank of the bayou and mooring lines were run out to the bank. Prior to mooring the vessel Magnolia made no soundings in the mooring area to determine whether there were any under water obstructions. There was evidence that the mooring area had been cleared and used previously by the shipyard, but there was no evidence as to the size of the vessels moored in the area. Bayou Teche, on which the shipyard is located, is a fresh water stream. The LATIMER remained at Dupuis Shipyard until December 8, 1956.

### IV.

Prior to December 8, 1956, Magnolia had been negotiating a sale of the vessel to Jocharanne and undertook to have the vessel moved from Dupuis Shipyard to Todd Shipyard in New Orleans where it was to be inspected by a representative of Jocharanne. Through a New Orleans broker it was arranged that the JARED would tow the LATIMER as a dead ship to Todd Shipyard.

### V.

The JARED arrived at Dupuis Shipyard on December 8, 1956. After pull-

ing the bow of the LATIMER off the bank, the tug made up to the stern of the LATIMER with cables and ropes so that the two vessels formed a single rigid unit. The tow proceeded into the Atchafalaya River and then into the Intracoastal Waterway. The draft of the JARED was approximately 8½ ft. and the draft of the LATIMER was approximately 1 ft. forward and 6½ ft. aft. After entering the Intracoastal Canal the master of the JARED decided that it would not be prudent to navigate at night. He continued to navigate for a short period after dark, and then put the port side of the LATIMER (the damage involved here was on the starboard side) against the bank of an island at the entrance to Bayou Chene. Lines were run from the LATIMER to the bank. The night was uneventful. Early the next morning the tow got underway and proceeded without incident to Algiers Cut where the LATIMER was again moored port side to the bank to await daylight. On this occasion the tow again navigated for a short time after nightfall. Again the night was uneventful. Early the following morning the tug again got underway, entered the Mississippi River and brought the LATIMER into the Todd Shipyard, thus completing the voyage. Claimant produced, with one exception, the entire crew of the JARED and satisfactorily explained her reason for not producing that crew member. These witnesses testified forthrightly and candidly. They denied that the LATIMER was involved in any collisions strandings or other incidents which might in any way account for the damage noted at Todd Shipyard. There is nothing in the record which would lead even to an inference that the JARED was unseaworthy or its crew members in any wise negligent. On the contrary, claimant has shown affirmatively that the JARED was fit for the tow, that she was properly crewed and that her crew exercised prudence and good judgment throughout.

## VI.

The LATIMER arrived at Todd Shipyard at 1:30 P.M. on December 10, and went on the ways on December 11, when she was inspected preliminarily by Mr. Walter Leander, who was acting for the purchaser Jocharanne. The preliminary inspection was made in company with a representative of the shipyard. At the time of the inspection he noted some indented areas on the starboard side running longitudinally from the vicinity of the No. 3 tank aft to the No. 7 tank. These indented areas were coated with barnacles, except in a portion where the barnacles had been scraped off. Since barnacles do not grow in fresh water, their presence in the indented areas would indicate that this damage was occasioned prior to the time that the vessel arrived at Dupuis Shipyard on Bayou Teche. Mr. Leander also noted that the internal framing in way of the indented areas was bent and damaged. He stated that in his opinion this damage was of recent origin being approximately one day to two or three weeks old. Following Mr. Leander's preliminary survey the owner of the JARED was put on notice and he arranged for a survey by Mr. Arthur G. Grant. Mr. Grant inspected the damage and testified that, in his opinion, the damage pre-existed the tow and was not caused during the tow. Mr. J. Lindgren of U. S. Salvage Association, acting apparently for Magnolia, who was still the owner of the vessel, also surveyed the damage and in his report which was introduced in evidence without objection, stated that, in his opinion, the damage noted "was not of recent origin". Mr. Lindgren reported his findings and his opinion to Mr. Leander, the purchaser's representative.

## VII.

Libelants failed to produce as witnesses the shipyard worker who accompanied Mr. Leander on his preliminary survey and Mr. Lindgren. To compound the matter, Libelants also failed to produce any of the navigating

crew of the LATIMER or the masters of the two tugs that moved the LATIMER from Orange, Texas, to Dupuis Shipyard. One of these masters was still in Magnolia's employ and the whereabouts of the other was known. Libelants have failed to explain their reasons for not producing these witnesses. The Court, therefore, must conclude that had these witnesses been produced they would have testified adversely to libelants' position. Coyle Lines, Incorporated v. United States (C.A.5, 1952), 195 F. 2d 737, 1952 A.M.C. 715.

## VIII.

The damage to the LATIMER noted at the time of the survey at Todd Shipyards on December 11, 1956, and subsequent dates, was not caused during the time that the LATIMER was in tow of the Tug JARED; at the times above mentioned and as above stated, the Tug JARED and her crew were guilty of no negligence but, on the contrary, performed their undertaking in a prudent and proper manner.

## CONCLUSIONS OF LAW

### I.

The Court has jurisdiction of this action in Admiralty and venue is properly laid in the Eastern District of Louisiana.

### II.

It was incumbent upon Libelant to prove that the damage to the LATIMER was occasioned during the time that the vessel was in the tow of the Tug JARED. The fact that damage is noted after a tow is not the basis for a presumption that it resulted from the negligence of the towing vessel. Stevens v. White City, 285 U.S. 195, 52 S.Ct. 347, 76 L.Ed. 699 (1932); The Lapwing, (C.A.5, 1945), 150 F.2d 214; Russell, Poling & Company, et al. v. Tug ALICE M. MORAN, et al. (D.C.N.Y., 1962), 205 F.Supp. 874, 1962 A.M.C. 618. A tug is not an insurer of her tow and the latter must carry the burden of proving that her damage resulted from negligence on the part of the tug. Negligence must be affirmatively shown and the burden of proving negligence rests upon those seeking to establish liability therefor. Stall & McDermott v. Tug SOUTHERN CROSS (C.A.5, 1952) 196 F.2d 309, 1952 A.M.C. 876; see also River Terminals Corp. v. Southwestern Sugar & Molasses Co. (C.A.5, 1960) 274 F.2d 36, 1960 A.M.C. 2064. Libelants have failed to carry their burden.

### III.

The proof adduced in this case leads to the conclusion that the damage to the LATIMER did not occur while that vessel was in tow of the Tug JARED and to the further conclusion that during the towage the JARED performed her undertaking in a prudent and proper manner.

A decree has been entered herein, dismissing the libel at Libelants' cost.