**Wanza Smith McGuffie, wife of/and Danny Paul McGUFFIE**

v.

**TRANSWORLD DRILLING COMPANY.**

**Civ. A. No. 84–2224.**

United States District Court, W.D. Louisiana, Lafayette-Opelousas Division.

Dec. 9, 1985.

Abadie, Harang & Coluin, Peter J. Abadie, Jr., New Orleans, La., for plaintiffs.

Deutsch, Kerrigan & Stiles, Howard L. Murphy, Christopher Tompkins, New Orleans, La., for defendant.

RULING ON POST TRIAL MOTION

W. EUGENE DAVIS, Circuit Judge, sitting by designation.

The defendant, Transworld Drilling Company (Transworld), filed a motion for judgment notwithstanding the verdict and alternatively for new trial following entry of a judgment on a verdict awarding compensatory and punitive damages against it. The only serious question presented in these motions is whether the punitive damage award should be allowed to stand. Because the award is bottomed solely on the reckless or wanton act of defendant's foreman or toolpusher, committed without knowledge or approval of officials of Transworld, I conclude that the judgment must be modified to delete the punitive damage award.

I.

Viewing the evidence in a light most favorable to the plaintiff, the jury was entitled to accept the following version of the facts:

Plaintiff Danny Paul McGuffie's action under the Jones Act and general maritime law arose out of his employment as a roughneck aboard the jackup drilling rig TRANSWORLD NO. 59. Plaintiff's seaman status was conceded by the defendant.

The TRANSWORLD NO. 59 and her crew were engaged in drilling an oil well in the Gulf of Mexico on June 7, 1984, the date of the accident. Mr. McGuffie began his work shift around noon on the day of his injury. His crew continued the work of running pipe in the hole that the previous crew had started. The pipe that was to be run in the hole was stored in racks on a level of the rig approximately twenty feet below the rig floor where plaintiff worked and where the pipe was stabbed into the hole to be lowered into the well. The particular operation that caused the accident related to the transfer of the pipe from the pipe rack level of the rig up to the drill floor. This transfer was accomplished by tying one end of a line to a length of pipe; the opposite end of the line was made fast to a mechanical hoist and when power was applied to the hoist, the pipe was pulled up a ramp onto the rig floor. When the pipe reached the rig floor, plaintiff and his fellow crewmembers stabbed the pipe into the hole and then the pipe was lowered into the well.

Shortly after plaintiff began his work shift that day, plaintiff and his fellow crewmembers saw that joints of pipe were frequently hanging up on the ramp, which caused difficulty in pulling the pipe up from the pipe rack to the drill floor. Closer inspection revealed that a portion of the metal ramp was broken and the bottom of the length of pipe was hanging up on the rough edges of the fractured metal. At times when a length of pipe hung up and the hoist continued to pull on it, the pipe would suddenly jerk free and catapult upwards onto the rig floor. When the bottom end of the pipe cleared the top of the ramp, the joint of pipe would swing out of control around the work area of the rig floor. This sent plaintiff and his fellow workers scurrying for cover behind or under some heavy object to protect them from the swinging pipe. After this occurred two or three times, the driller, plaintiff's immedi-

ate supervisor, called Mr. Joe Sadler, the toolpusher and foreman of the Transworld personnel aboard the rig, and asked for a welder to repair the broken ramp. The toolpusher refused to halt the job and allow the ramp to be repaired on grounds that it required too much time at this particularly critical phase of the operations. During that afternoon, the driller repeated his request two or three times and the toolpusher consistently refused the requests to repair the broken ramp. The plaintiff and his fellow crewmembers continued this operation until approximately 6:30 p.m. when plaintiff was struck by a joint of pipe after it catapulted, out of control, on the rig floor.

Mr. Sadler, as toolpusher, was the supervisor in direct charge of the TRANSWORLD 59 and all Transworld employees aboard the rig. No evidence was adduced indicating that Mr. Sadler had any authority or responsibility beyond the operations aboard the TRANSWORLD 59 and the employees assigned to the rig.

At the close of the evidence, I was persuaded that the jury was entitled to conclude from the testimony that Mr. Sadler was reckless and wanton in declining to repair the ramp and avoid the extreme hazard created by this defect. I did not focus on the total absence of evidence of knowledge by corporate officers or policymakers that Mr. Sadler would respond as he did to the dangerous conditions aboard the vessel.

Defendant's motion for directed verdict was denied and the jury, in response to special interrogatories, found the defendant negligent, the vessel unseaworthy and no contributory fault on the part of the plaintiff. The jury fixed plaintiff's compensatory damages at $693,520 (plus $15,000 to Mrs. McGuffie) and assessed $500,000 in punitive damages against defendant.

## II.

We now turn to the issue at hand: Can the isolated negligent conduct of a foreman committed without the knowledge or approval of the employer serve as a predicate to impose punitive damages against the employer? We look to the general maritime law for a solution.

The *Complaint of Merry Shipping Co.*, 650 F.2d 622 (5th Cir.1981), the seminal case in this circuit which permitted recovery of punitive damages under the general maritime law, did not face the question which confronts us today. Several courts have faced this problem, however, and except for a single Ninth Circuit case, all the cases we discovered, which were decided under the general maritime law, are in accord. They hold that the principal or master cannot be cast for punitive damages for the willful or reckless act of the agent or employee unless the act was committed with the approval or knowledge of the principal.

This issue was first presented to the Supreme Court in an admiralty case in *The Amiable Nancy*, 16 U.S. (3 Wheat) 546, 4 L.Ed. 456 (1818). In this case, the plaintiff's ship was boarded and plundered by the crew of a vessel owned by the defendants. The court considered whether the defendants were responsible for punitive damages for the malicious acts of its crew committed without the approval or knowledge of the defendant. The Court stated:

> Upon the facts disclosed in the evidence, this must be pronounced a case of gross and wanton outrage, without any just provocation or excuse. Under such circumstances, the honor of the country and the duty of the court equally require that a just compensation should be made to the unoffending neutrals, for all the injuries and losses actually sustained by them. And if this were a suit against the original wrong doers, it might be proper to go yet further, and visit upon them in the shape of exemplary damages, the proper punishment which belongs to such lawless misconduct. But it is to be considered, that this is a suit against the owners of the privateer, upon whom the law has, from motives of policy, devolved a responsibility for the conduct of the officers and crew employed by them, and yet, from the nature of the service, they can scarcely ever be able to

secure to themselves an adequate indemnity in cases of loss. They are innocent of the demerit of this transaction, having neither directed it nor countenanced it, nor participated in it in the slightest degree. Under such circumstances, we are of the opinion that they are bound to repair all the real injuries and personal wrongs sustained by the libelants, but they are not bound to the extent of vindictive damages.

16 U.S. at 558–59, 3 Wheat at 558–59.[1]

In *Pacific Packing & Navigation Co. v. Fielding*, 136 F. 577 (9th Cir.1905), the captain of the defendant's vessel falsely imprisoned the ship's purser. The district court cast the shipowner for punitive damages and the circuit court reversed. The court relied heavily upon *The Amiable Nancy* and Prentice and concluded that punitive damages can only be awarded against one who has participated in the offense.

In a more recent opinion, *U.S. Steel v. Fuhrman*, 407 F.2d 1143 (6th Cir.1969), *cert. denied*, 398 U.S. 958, 90 S.Ct. 2162, 26 L.Ed.2d 542 (1970) a vessel owned by the defendant, U.S. Steel, collided with another ship in a heavy fog. Within a few minutes after the collision, Captain Joppich of the CEDARVILLE decided to beach the vessel rather than abandon ship. This proved to be a disastrous error in judgment because the ship capsized during its attempted run for the beach and ten crewmembers were drowned. The district court imposed punitive damages against U.S. Steel on grounds that its officials, who were in radio contact with Captain Joppich, should have intervened and countermanded the captain's order to beach the vessel and that failure to do so was in callous disregard of the duty of U.S. Steel to its crewmembers. The district court also found that the officials of U.S. Steel routinely ordered its ships to proceed at full speed in fog and deviate from recommended courses. The Sixth Cir-

cuit found both of the above factual findings of the district court clearly erroneous. The Sixth Circuit then considered whether the acts of Captain Joppich could be imputed to U.S. Steel and serve as a basis for the punitive damage award:

> We think the better rule is that punitive damages are not recoverable against the owner of a vessel for the act of the master unless it can be shown that the owner authorized or ratified the acts of the master either before or after the accident. Punitive damages also may be recoverable if the acts complained of were those of an unfit master and the owner was reckless in employing him. *Lakeshore & Michigan Southern Railway Co. v. Prentice* ...; *The Amiable Nancy* ... *Pacific Packing & Navigation Co. v. Fielding*....

407 F.2d at 1148.

The only other expression on this question in an admiralty case by the Supreme Court or a federal court of appeals since that time that we have discovered is *Protectus Alpha Navigation Co. v. North Pacific Grain Growers*, 767 F.2d 1379 (9th Cir.1985). In *Protectus*, the Ninth Circuit affirmed imposition of punitive damages against the owner of a dock terminal for the reckless conduct of its dock foreman. The plaintiff established that a vessel caught fire while tied up at defendant's dock. When the flames were almost under control, defendant's foreman arrived on the scene and insisted on casting off the ship. The vessel then drifted away from the firefighting equipment positioned on the dock and at least one fireman left aboard the vessel was killed, another seriously injured and the vessel ultimately destroyed. The Ninth Circuit, relying primarily on the Restatement of Torts[2], held that the defendant was properly cast for punitive damages because Anderson, its foreman, was a man-

---

**1.** See also *Lakeshore & M.S. Railway Co. v. Prentice*, 147 U.S. 101, 13 S.Ct. 261, 37 L.Ed. 97 (1893). This opinion by the Supreme Court was not rendered in an admiralty case but the Court relied heavily upon *The Amiable Nancy* and reaffirmed the principle announced in that case.

**2.** Restatement (Second) of Torts § 909(c) (1977).

agerial employee acting in the scope of his employment.

Section 909, Restatement of Torts relied upon by the Ninth Circuit provides:

> Punitive damages can properly be awarded against a master or other principal because of an act by an agent if, but only if,
>
> (a) the principle or a managerial agent authorized the doing and the manner of the act, or
>
> (b) the agent was unfit and the principal or a managerial agent was reckless in employing or retaining him, or
>
> (c) the agent was employed in a managerial capacity and was acting in the scope of employment, or
>
> (d) the principal or a managerial agent of the principal ratified or approved the act.

The Ninth Circuit reasoned that the dock foreman was an agent "employed in a managerial capacity" under subsection (c) and thus his reckless act was imputed to the dock owner. The *Protectus* court gave the following reasons for adopting the restatement position on this issue: 1) Most courts have rejected the corporate authorization or ratification standard; 2) requiring corporate authorization or ratification would make recovery of punitive damages against a corporation impractical.

It may well be that most states have adopted the Restatement position; however, our review of the general maritime law on the issue reflects that the Ninth Circuit decision in *Protectus* is the only admiralty court which has adopted this view. Indeed, the principal authorities relied upon by the Fifth Circuit in *Merry Shipping* in determining that an action would lie for punitive damages under the general maritime law include the cases discussed above, namely, *The Amiable Nancy, Lakeshore and M.S. Railway Co. v. Prentice* and *U.S. Steel v. Fuhrman.* I believe the sounder view on this issue is expressed in these authorities and I also conclude that the Fifth Circuit would look to these authorities for determining the

restrictions and limitations on the action for punitive damages under the general maritime law. Also, I do not find the policy arguments made by the *Protectus* court persuasive. Deterrence and punishment have been the traditional policy arguments in favor of imposing punitive damages. I agree with *McCormick* that "there would seem to be little justification for punishing the master for willfulness or wantonness of which the agent is alone guilty." C.T. McCormick, Handbook on the Law of Damages § 80 at 282 (1935). Also, I seriously question whether the threat of punitive damages would enable the employer to perform the difficult task of predicting or controlling the reckless or malicious conduct of its employees which is generally sporadic.[3]

### CONCLUSION

Because no evidence was adduced which tended to show that Transworld authorized or ratified the acts of its toolpusher, Mr. Sadler, either before or after the accident or that Transworld was at fault in employing Mr. Sadler, I conclude that the award for punitive damages cannot stand. Accordingly, the motion for judgment notwithstanding the verdict is granted to the extent of striking the award for punitive damages. The motion for judgment NOV and for new trial are in all other respects denied.

---

3. See Note, The Assessment of Punitive Damages Against an Entrepreneur for the Malicious Torts of His Employees, 70 Yale Law Journal 1296, 1304 (1961).