**Terry WILCOX, wife of/and
Michael Wilcox**

v.

**KERR–McGEE CORPORATION, Transworld Drilling Company and Northwestern National Insurance Company.**

Civ. A. No. 87–2319.

United States District Court,
E.D. Louisiana.

Feb. 9, 1989.

## OPINION OF THE COURT

MITCHELL, Senior District Judge.

This civil action was tried before this Court on October 11 through 13, 1988, and arises out of an alleged wrist injury sustained by plaintiff Michael Wilcox in his capacity as a Jones Act seaman on jack-up Rig 71, owned by Transworld Drilling Company (Transworld). This injury was allegedly caused by the acts and omissions of defendants, Transworld, his employer, and Kerr–McGee Corporation.

The parties have stipulated that plaintiff was a Jones Act seaman. They have further stipulated that Transworld Drilling was plaintiff's Jones Act employer, and that Transworld's actions in connection with two alleged accidents more fully described herein were negligent under Jones Act standards. Lastly, the parties have stipulated that the condition of the draw works' braking mechanism was such that it constituted an unseaworthy condition.

The issues facing this Court are whether or not plaintiff's wrist condition was caused by the accidents in question or was the result of some previous injury; whether the actions of the defendants were such as to warrant an award for punitive damages, and whether Transworld's corporate veil should be pierced. Having considered the testimony, exhibits, stipulations, depositions and arguments of counsel, the Court makes the following findings of fact and conclusions of law:

Plaintiffs are Michael Wilcox and his wife, Terry Wilcox. Both persons are domiciliaries of Pensacola, Florida.[1]

The aforementioned defendants are Delaware corporations domiciled in Oklahoma; Kerr–McGee is the parent corporation of Transworld, its wholly owned subsidiary.

Northwestern National is a non-resident insurer authorized to do business in this district that had in effect an insurance policy covering Kerr–McGee and Transworld as of the time of plaintiff's accidents.

Jurisdiction is based on the Jones Act, 46 U.S.C.App. § 688, and under the general maritime law of the United States.

### I. *Causation Issue*

Plaintiff, Michael Wilcox, was born on March 22, 1955, and became employed by Transworld Drilling on August 10, 1977. From all the evidence presented, it is apparent that Wilcox was a steady, hard-working, industrious and dedicated employee who, through hard work, steadily improved his position in the company, going from a rotary helper to a grade "A" driller for Transworld.

Plaintiff signed a 24 month, 28 days on—28 days off, contract with Transworld on January 20, 1980, which placed him on Rig 71 in Indonesia as an Assistant Driller. On May 12, 1981, he was made a driller on the same rig. On June 1, 1981, he was given a grade "B" designation and on June 1, 1982, he was promoted to a grade "A" driller. (See Plaintiffs' Ex. 29.)

His duties as a driller revolved around his operating the draw works of Rig 71. This particular draw works was a Continental Emsco C–3, Type 2 Draw Works, which included a braking mechanism, brake handle and driller's console, for raising and lowering the 40,000 pound traveling block of Rig 71's drilling derrick. A driller would use the draw works to control the velocity of the traveling block or to stop it altogether. In order to stop the block, the driller would either use an electric brake or the manual brake which was controlled by the brake handle. By rotating the handle downward, the brakes engaged within the draw works drum, stopping the cable

---

1. Mrs. Wilcox's cause of action is based upon  her loss of consortium.

spooled on the draw works drum. (See Plaintiffs' Ex. 5., copy appended hereto.)

The braking system on the draw works consisted of two brake bands surrounding either side of the draw works drum. (See Plaintiffs' Ex. 5). Attached to each brake band were thirteen brake pads, or blocks, plus one wiper pad, for a total of 26 brake pads plus two wiper pads in all.

For some reason, on this particular model of Continental Emsco draw works, the brake handle had an unusually strong kick to it. In fact, while the rig was in Indonesia, the brake handle kicked and flew back so violently that it hit the console, causing Transworld to attempt to remedy the situation by welding to the console a piece of metal stock that would then be fitted with a rubber cup that was to absorb most of the shock and not damage the equipment. That cup was replaced two or three times every 30 days. Finally even that method failed, and the console itself had to be repaired by Francis A. Ritchie, a welder on Rig 71, while the rig was still in Indonesia. (See Ritchie Deposition, pp. 8–15.)

Transworld was aware, at least as early as June 14, 1984, that an antikicking device was available from Continental Emsco, the manufacturer of the draw works. (See Plaintiffs' Ex. 2, Service Bulletin from Continental Emsco dated June 14, 1984.) This device was ordered by Transworld for at least one of its rigs in 1984. (See Plaintiffs' Ex. 18, Request for Purchase for Rig 68, approved July 25, 1984.)

Based on these facts, it is certain that Wilcox was being subjected to a constant kick whenever he operated the draw works. In fact, by March of 1981, he began to wear a wrist bandage on his right wrist. He worked as a driller on Rig 71 in Indonesia for the entire contract period through 1983.

Concommitantly, Wilcox had begun to lift weights sometime in 1978, without problems until March 31, 1982. While he was doing reverse curls on that date, he heard a pop in his right wrist and experienced severe pain. This incident occurred about a year after he began working the draw works on Rig 71. He was treated at the time at Baptist Hospital in Pensacola, Florida, where the record indicates that his tendons were still intact and the pain was over the radial dorsum to the ulnar styloid. His wrist was placed in a splint; no broken bones were found. He removed the splint four weeks later and returned to work.

On July 8, 1982, Wilcox visited Dr. Andrew C. Gygi because he had some discomfort in his right wrist. The doctor believed at that time that Wilcox had sustained a partial rupture of the intercarpal ligaments which are the ligaments that hold the small bones of the wrist together, and that it would take time to heal; he noted that there were no popping sounds but the pain was in the ulnar side of the wrist. Wilcox did not consider the problem to be disabling; however, the doctor advised him to avoid activities (such as reverse curls) which would have risked reinjury, recommended a program of strengthening exercises and instructed him to wear a leather wrist gauntlet during those times he was performing particularly stressful activities. He missed no work as a result of that occurrence.

On May 12, 1983, Wilcox visited Dr. Gygi complaining of pain about his forearms when lifting weights. Dr. Gygi noted incidently that his right wrist was popping at that time. "He has full ROM of all major joints including wrist, elbow and all small joints of his hands. I cannot elicit any tenderness on any resisted motion." (See Plaintiffs' Ex. 22, p. X.) Dr. Gygi diagnosed the problem as Wilcox having an overstrain syndrome of the muscles of the forearm. This problem was not connected with the first injury mentioned herein since the pain was in a different location; however, some problem did exist in the wrist since it had begun to pop. By that time, Wilcox had been working on Rig 71 for about a year and a half.

Wilcox was transferred to the Gulf of Mexico in 1984. By February of 1984, Rig 71 had been moved from Indonesia to the Gulf of Mexico, and he was again working on Rig 71's draw works. On August 31, 1984, he visited Dr. Gygi again. By mid-August, Wilcox was in almost constant dis-

comfort in the wrist. Dr. Gygi found that his wrist popped every time he "pronated and supinated" his wrist. The pain was located in the "interval between the radius and ulna just adjacent to the tip of the distal ulna." (See Plaintiffs' Ex. 22, p. XI.) Dr. Gygi diagnosed the problem as a tear of the distal-radial ulnar cartilage and recommended that he see Dr. Robert B. Cameron, a specialist in wrist disorders.

Dr. Gygi testified in his deposition that the cause of what he diagnosed at the August 31, 1984, visit would not have been caused by weight lifting; rather it is the type of problem that would be caused by "some type of a rotational injury or some type of an injury sustained in a fall." Further, he testified that he had never heard of anyone tearing the distal—radial ulner cartilage simply by lifting weights. (See Gygi Deposition, pp. 32–34.) Also, it is noted that at this point Dr. Gygi did not tell Wilcox not to return to work, which Wilcox did, indicating that Wilcox was not disabled. (See Gygi Deposition, p. 56.)

On September 13, 1984, Wilcox experienced his first accident as a result of the kicking draw works. While he was clutching the draw works in low gear, the brake handle kicked and twisted his right wrist. He then released the brake handle which bounced and struck his right wrist once again. Plaintiff's wrist had to be packed in ice and wrapped after this incident, and an accident report was filed contemporaneously.

By happenstance, Wilcox's first appointment with Dr. Cameron was for the next day. Cameron's notes indicate that Wilcox related the history of problems with his wrist from the 1982 weight lifting incident to the September rig accident. An arthrogram and x-rays of his wrist were taken and were reviewed on September 19, 1984, at which time Dr. Cameron stated that the arthrogram was "completely negative."

An arthrogram should have shown the tear in the torn distal radioulnar cartilage or the triangular fibrocartiloginous complex as it is referred to by Dr. Cameron. (See Gygi Deposition, p. 40, stating that these two terms denote basically the same structure.) It should also be noted that we can find mention in the record of only one arthrogram being taken or reviewed, and that was on September 19, 1984. Importantly, Dr. Cameron testified on January 14, 1988, by depostion that he later found a tear in the triangular fibrocartilage at the time of the fourth surgery. He stated,

In fact, I was surprised to find it, because the previous arthrogram had been negative. An arthrogram is usually—usually, but not always—helpful in diagnosing that condition.

In this patient, this case, I believe that rather than a second—a subsequent injury to the arthrogram [sic], I believe the arthrogram was a false negative.

(See Cameron Deposition, January 14, 1988, p. 36.)

Dr. Cameron treated Wilcox on September 19, 1984, with injections successfully; Wilcox did not require Dr. Cameron's help again for seven months until a second accident occurred in April of 1985. (See Cameron Deposition, January 14, 1988, p. 20.) Wilcox had returned to Rig 71 and had continued to work.

The next incident involving the brakes occurred on March 31, 1985, while driller William David Williams was operating the draw works. He was tripping out of the hole when the brakes stopped holding, causing the block (which raises and lowers the pipe out of and into the hole) to fall. Upon inspection of the brake band, it was found to contain grease and oil. According to the IADC Daily Drilling Report signed by Williams, two of the 26 brake pads were found to be worn down to the brass screws; the rest of the brake pads had ¾ to 1 inch of pad remaining. New brake pads were ordered. Meanwhile, the old brake pads were steam cleaned. After the brakes were adjusted, the block was worked up and down with the cover off the brakes.

Vernon Sonnier, the toolpusher for Transworld on duty at that time, found the brakes to be working well. Sonnier testified that he believed the brakes had failed to work properly because the driller had overheated them by failing to engage his electric brake when he encountered some

tight spots while coming out of the hole. While there was credible testimony that the electric brake was not normally engaged while coming out of the hole, Sonnier believed that the driller should have used it in this case because he kept encountering some tight spots. The fact that some tight spots were encountered is supported by Sonnier's notes on the Toolpusher's Daily Drilling Report dated April 1, 1985, stating in pertinent part, "[S]topping every 15' from approx. 60'. Last 15' brakes would not hold." (See Plaintiffs' Ex. 8.) Sonnier believed the manual brakes were overheated while the driller was attempting to work through these tight spots. Sonnier stated that he had worked on other rigs and seen other brakes get heated up in this fashion.

After testing the brakes with the cover off, Sonnier then had them reassembled and tested by free-falling the block several times. The brakes worked fine during these tests, and Sonnier decided it was safe to continue operations. He so advised Dave Beard, his supervisor and the drilling superintendent, who was located in Transworld's Lafayette, Louisiana office.

A few days after the accident the 26 new brake pads arrived. Thirteen were installed on a new brake band that was already on the rig. They were not, however, immediately installed on the draw works, since drilling was ongoing. Rig Maintenance Supervisor James H. Nowell testified by deposition that he did not feel that the condition of the brakes was unsafe enough to stop the rig from working to install the new brake band and pads. He stated that the brakes were not worn down "out of specs".

Toolpusher John Murphy came on to relieve Sonnier on April 3, 1985. On April 5, 1985, Wilcox returned to the rig. He operated the draw works without incident until April 11, 1985, when the second accident at issue herein occurred. On that date, the brakes again failed, and the block began to fall. Plaintiff clutched the draw works so that the block would not hit the rig floor. The brake handle kicked violently, twisting and jarring his right wrist, which again had to be packed in ice and wrapped. Transworld at that time replaced the warped brake band with the new band and brake pads. It also put new pads on the remaining band.

Dr. Cameron examined Wilcox on April 15, 1985, four days after the second accident. He treated him again by injection and noted that probably he had "a chronic sublaxation of the extensor carpi ulnaris" which would be a tendon problem. The injections did not alleviate the problem.

On May 21, 1985, Dr. Cameron performed the first of five surgeries on Wilcox's wrist and reconstructed the sixth dorsal compartment of his right wrist in response to Dr. Cameron's diagnosis of a probable sublaxation problem. Dr. Cameron testified at his second deposition that a sublaxation of the extensor carpi ulnaris is generally felt to be the consequence of a twisting movement. Wilcox, however, continued to have problems with the wrist.[2]

A gaglion cyst, which is the "the outpouching of material from a joint, filled with a gelatinous fluid", had to be removed on October 22, 1985. According to Dr. Cameron, this problem was related in some way to the problem which caused the necessity for the first operation.

On November 26, 1985, Wilcox returned to work, this time on Rig 69, where he worked as a driller until April 30, 1986. He continued regular visits to Dr. Cameron and received some physical therapy during this period. When Wilcox experienced pain, Dr. Cameron attempted to relieve the problem with injections. By April 14, 1986, Dr. Cameron noted that Wilcox was "in virtually the same place as before" and that Wilcox would not be able to continue his work activities too much longer because of his pain. He then scheduled the third surgery. (See Plaintiffs' Ex. 22, p. XV.)

Also on April 14, 1986, Dr. Cameron wrote a letter to Transworld Drilling Com-

---

2. It must be noted that Dr. Cameron now is not certain whether the sublaxation problem existed because of the subsequent difficulties that Wilcox had. Because his problems did not cease with the first operation, Dr. Cameron questioned whether the sublaxation actually occurred. (See Cameron Deposition, January 14, 1988, p. 61.)

pany expressing his belief that there was a problem with the distal radial ulnar joint which, as noted earlier, was the location of Dr. Gygi's initial diagnosis of Wilcox's problem.

In the letter contained in Plaintiffs' Exhibit 22, Dr. Cameron wrote:

I have not considered this particular part of his wrist joint complex as the cause of symptoms previously because his previous work-up indicated the triangular fibrocartilage complex was intact.

However, his continued symptoms and the temporary relief afforded him by injection in this joint lead me to believe there is pathology at the distal radioulnar joint articulation.

I plan to explore this area surgically and perhaps do a hemi-resection interposition arthroplasty of the distal radioulnar joint if I am able to demonstrate pathology about this joint.

*I consider his continued symptomatology to be related to his workmen's compensation injury of September 13, 1984.* (emphasis added).[3]

(See Plaintiffs' Ex. 22.)

Indeed, Dr. Cameron operated for the third time on May 1, 1986, and found "sufficient pathology" around this joint and removed the distal ulna which is the bone that sticks up on the side of the wrist. After removing the bone, he saw:

... an obvious abnormality in the triangular fibrocartilage and gentle pressure on the cartilage allowed joint fluid to come into the distal radial ulnar joint. The fluid was presumably coming from the wrist joint. I was able to probe the defect which was immediately adjacent to the radial attachment and could probe right into the wrist joint itself. This appeared to be the primary pathologic process. I felt like it had been treated adequately by decompression of the distal ulnar and therefore, did nothing further.

(See Plaintiffs' Ex. 22, Operative Record, May 1, 1986, p. 2.)

Dr. Cameron testified that during the operation he saw a tear of the cartilage, and it was his opinion that such a tear would result from a repetitive twisting and turning and loading the wrist (such as Wilcox experienced on Rig 71) rather than from lifting weights. (See Cameron Deposition, February 23, 1988, pp. 55–57.)

Unfortunately, this third surgery did not relieve Wilcox's pain. By November 17, 1986, Dr. Cameron decided that an arthroscopy of the wrist was called for in order to determine what was still causing Wilcox pain.

The only thin [sic] I can offer [Wilcox] further at this point that might be of benefit would be arthroscopy to visuialize the triangular fibrocartilage from its distal surface. I did not satisfactorily visualize this from the proximal surface at the time of the hemiresection arthroplasty of the distal radioulnar joint.

(See Plaintiffs' Ex. 22, p. XVII.) Indeed, during this fourth procedure, Dr. Cameron found an old tear which he debrided to make it a smooth defect that would not interfere with the movement of the wrist. (See Cameron Deposition, Feb. 23, 1988, p. 63.) The Operative Report of December 16, 1986 states:

In fact, there was a portion of articular surface or triangular fibrocartilage that overlapped the ulnar side of the distal radius though the defect was probably a little further out in the substance of the triangular fibrocartilage.

(See Plaintiffs' Ex. 22.)

This operation virtually relieved the pain in Wilcox's wrist; however, he began experiencing trouble with the ulnar nerve which in some way was related to his total care. (See Cameron Deposition, February 23, 1986, pp. 64–65.) On November 17, 1987, Wilcox underwent surgery for the transposition of the ulnar nerve and has gained relief from the procedure.

---

**3.** When questioned about this letter, Dr. Cameron stated that Wilcox presented at the very least an aggravation of a pre-existing condition and that since he had been accepted as a Workmen's Compensation complaint, it was in that context that the paragraph was intended. (See Cameron Deposition, Feb. 23, 1988, p. 25.)

■ Michael Wilcox is now 20 percent impaired for life because of his wrist and is 5 percent impaired for life as a result of the nerve problem. We find that these disabilities are the direct result of the negligence of Transworld and the unseaworthy condition of the draw works on Transworld's Rig 71.

Defendants have maintained throughout the trial of this matter that Wilcox's injuries were the result of his weight lifting accident or, in the alternative, that the injuries caused by the two accidents on Rig 71 were only a temporary aggravation of a pre-existing injury. It is true that both doctors were hesitant to state specifically which of the three injuries, the weight lifting incident in 1982 or the two accidents on Rig 71, were the cause of his problems. However, after hearing the testimony of the plaintiff, together with the testimony of other crew members and reviewing all of the medical records, we find that plaintiff has met his burden of proving by a preponderance of the evidence that indeed the constant strain to which Wilcox's wrist was subjected caused Wilcox's injury and resulting disability.

We note that it was only after Dr. Cameron finally debrided the tear of the triangular fibrocartilage of Wilcox's right wrist that Wilcox actually was relieved of his pain. This kind of tear is most likely caused by a *rotational* occurrence, not by lifting weights. Based on the overall weight of evidence we hold that it was the continual wrenching of the malfunctioning brake handle that caused Wilcox's injuries. We find that he was a dedicated worker, placed utmost importance on his job, and probably did not want to believe that the source of his livelihood was the cause of his pain.

In the alternative, if we were to rely *solely* on the medical testimony, we would still find that the two reported accidents caused by the malfunctioning, unseaworthy draw works were either severe, disabling work aggravations of a non-disabling preexistent condition, or that we cannot apportion the resulting disability between the preexistent condition and those aggra-

vating injuries. Therefore, we find defendants liable for Wilcox's condition. See *Sandidge v. Salen Offshore Drilling Co.,* 764 F.2d 252, 261–63 (CA5–1985) (charge attributing all disability to culpable employer even though employee experienced previous pain found to be not misleading as to the applicable law); 3 Devitt and Blackmore, *Federal Jury Practice and Instructions* § 85.03 (1987); U.S. Fifth Circuit District Judges Association, *Pattern Jury Instructions—Civil Cases,* pp. 54, 135 (1983).

## II. *Punitive Damages Issue*

■ Punitive damages are recoverable under the general maritime law where there is willful and wanton misconduct, reflecting a reckless disregard for the safety of the crew. *Complaint of Merry Shipping, Inc.,* 650 F.2d 622, (CA5–1981). This court must determine whether the actions or omissions of the defendants were such as to warrant an award of punitive damages.

■ Actually, there are two separate questions involved in the punitive damages issue. The first is whether or not defendant's conduct in failing to install the antikick device earlier, and/or in failing to stop the drilling operation after the first accident and await the arrival of the new brake pads, or in failing to change the brake band and pads on the drawworks as soon as the new equipment was received, constituted wanton misconduct. The second question is whether any corporate officer or policymaker of Transworld authorized or ratified the acts alleged to constitute wanton misconduct.

We first note for the record that in spite of plaintiffs' counsel's assertions that the brakes had not been regularly inspected for some time prior to plaintiff's two accidents, it is clear from a review of the Scheduled Maintenance Records (See Plaintiffs' Ex. 23) that inspections were made of the brakes, including the brake lining wear, approximately every three months. The last inspection before the September, 1984 accident occurred the week of July 13 through 19, 1984. There was no indication that there was any warping of the brake band or any excessive wear on the brakes

at that time. The brakes were again inspected for lining wear in November, 1984, and February, 1985. Again, no evidence was presented that the brake band was warped or that the lining on the brakes was dangerously worn at those times.

### A. *Antikick Device*

On December 6, 1984, a couple of months after plaintiff's first accident, the kick-kit for Rig 71 was approved for purchase by D.A. Beard, the aforementioned drilling superintendent for Transworld, who was located in the Lafayette office. According to the deposition testimony of toolpusher Danny Vinson Stowell, it may have taken as much as a month to get to the rig. This device was not installed, however, until May, 1985, when the rig was in downtime. (See Plaintiffs' Exs. 19 and 38.)

There is clear evidence that the brakes on the drawworks on Rig 71 had an excessive kick for quite some time. This was evidently a common problem on this particular type of drawworks, as evidenced by the aforementioned Continental Emsco Service Bulletin dated June 14, 1984. (See Plaintiffs' Ex. 2.) It is also clear that drilling superintendent Dave Beard was aware of the existence of this device before plaintiff's first accident, as he approved the purchase order for the kick kit to be installed on Rig 68. (See Plaintiffs' Ex. 18.) Since there is an abundance of evidence that the brakes on Rig 71 had been kicking since 1981, and that the drillers had been complaining about them, it is certain that all toolpushers working on the rig were aware of the problem well before the first accident in September, 1984. However, even assuming that all toolpushers were also aware of the existence of the antikick device prior to the first accident, we are unable to find that the failure to order this device earlier, or the failure to install the device as soon as it was received, constituted the kind of willful or wanton misconduct necessary for an award of punitive damages.

As stated above, the brakes had been kicking since at least 1981. The brakes nevertheless continued to do what they were designed to do, i.e., stop the block, until the incident on March 31, 1985, which was the first time the brakes failed to hold the block. Upon inspection immediately following the incident, it was observed at that time that one of the brake bands was warped. While it seemed to be common knowledge that the kicking of the brakes caused the band to warp more, since the brakes had been kicking for at least three years but had nevertheless continued to perform their job up to that point, we are unable to find that the toolpusher, whose job responsibility it was to make these kinds of decisions, exhibited reckless disregard for the safety of his crew in failing to install the antikick device as soon as it was received on Rig 71.

Also, even assuming the toolpushers were aware all along that the excessive kicking was causing plaintiff to experience some soreness in his right wrist, we are unable to say that this knowledge renders their conduct, in failing to interrupt drilling operations long enough to install the device, willful or wanton. Certainly it is very common for there to be complaints of pain and soreness from crewmembers working twelve hour shifts with heavy equipment in this type of industry. It would be unreasonable to find toolpushers guilty of reckless disregard for the safety of their crew simply because they failed to shut down operations to install a device such as the one in question, even though they were no doubt aware that the device would alleviate some of the kicking, which would in all probability alleviate some of the soreness experienced by the operator of the equipment, in this case, Michael Wilcox.

### B. *Failure to Install New Brakes*

The only remaining question is whether the failure to stop the drilling operations once the new brake pads were received and install them, along with the replacement brake band, into the draw works, constituted willfull and wanton misconduct. Actually, the operative question in our view is whether the decision to continue drilling, once the condition of the brakes was discovered immediately after the block fell the first time on March 31, 1985, exhibited reckless disregard for the safety of the

crew. For, if Transworld reasonably believed that it was safe enough not to shut down drilling operations immediately and await the arrival of the new brake pads, then it was reasonable for Transworld not to shut down immediately once the new pads were received.

As noted earlier, toolpusher Vernon Sonnier testified that after inspecting the brakes and having them steam cleaned, he believed that the brakes had failed to stop the block because they had been improperly heated up, and that operations could be safely continued, notwithstanding the fact that one of the brake bands was warped and two of the brake pads worn down. He testified that he had the responsibility of the rig when he was on it. Further, he stated that Transworld depended on his opinion as to whether or not to go ahead and drill and as to the safety of drilling.

Sonnier, whose job as a toolpusher required him to be out on the rig most of the time and who would have been in just as much danger as the rest of the crew if the brakes were not safe to operate, nevertheless believed after testing the brakes that they were safe. Although it turned out that Sonnier was evidently mistaken about the safety of the brakes, we do not find that his decision to continue operations exhibited reckless disregard for the safety of others.

According to Sonnier, the new pads arrived the night before he went off duty, which was April 2, 1985. He was relieved by toolpusher John Murphy. As noted above, the new pads were not installed until right after the second accident on April 11, 1985, during which plaintiff's wrist was reinjured. Murphy was evidently relying on Sonnier's opinion of what caused the accident to happen in deciding not to install the pads as soon as they were received. Under the circumstances, we do not find that the failure to do so constituted willful or wanton misconduct.

Since we do not find that any acts or omissions on the part of Transworld employees in relation to the failure of the brakes on Rig 71 would justify an award of punitive damages, we find it unnecessary to consider whether the evidence offered by plaintiff of other allegedly grossly negligent acts on the part of defendants unrelated to the present case is relevant or admissible.

### C. *Liability of Transworld*

Even if the failure to stop operations after the first time the block fell had constituted willful misconduct, we would not find, under the circumstances of this case, that Transworld had authorized or ratified the actions of the toolpusher in such a manner as to render it liable for punitive damages.

Drilling Superintendant Dave Beard was located in the Lafayette office of Transworld. Although he was listed as a will call witness by defendant, he was not called to testify. Plaintiff asked this court to apply the adverse inference rule and assume that his testimony would have been unfavorable. Generally, whether to employ the adverse inference is a matter of discretion for the fact finder. *International Union (UAW) v. N.L.R.B.*, 459 F.2d 1329 (CA D.C.–1972). Defendants have failed to explain their reasons for not producing this witness. Therefore, we must conclude that Beard would have testified contrary to defendants' position. *Magnolia Petroleum Co. v. Tug Jared*, 216 F.Supp. 322, 324–25 (E.D.La.1963). *See also U.S. v. Blakemore*, 489 F.2d 193 (CA6–1973). We will assume that Beard spoke to Sonnier after the block fell for the first time and that Beard ratified Sonnier's decision to continue drilling.

We find the instant fact situation analagous to the situation in *U.S. Steel v. Fuhrman*, 407 F.2d 1143 (CA6–1969), noted with approval in *McGuffie v. Transworld*, 625 F.Supp. 369 (W.D.La.1985). In *Fuhrman*, the master of a vessel, following a collision, contacted the office in Pittsburgh and informed them that a collision had taken place. The manager of the fleet was informed of the collision and told that the vessel was seriously holed and taking water. The manager did not contact the vessel. A few minutes later, the master made a decision to beach the vessel rather than abandon ship. During the attempted run

for the beach, the vessel capsized, killing ten men and injuring others.

The district court found that the manager of the fleet learned of the decision to beach the vessel prior to its sinking, and that because of his familiarity with the construction of the ship, he knew with certainty that the attempt would fail. The Sixth Circuit, however, found no support in the record that the fleet manager or any other official of U.S. Steel knew the full extent of the seriousness of the situation or that the beaching attempt was a certain failure.

> We are not prepared to hold, however, that company officials sitting hundreds of miles away had the obligation under the facts of the case to make a decision as to the best course of action to be taken and to countermand the orders of the master who was on the scene and in the middle of the emergency.

*Fuhrman,* 407 F.2d at 1147.

Instant case can be distinguished, of course. Here there was no such immediate emergency requiring an almost instant decision by the master of the vessel, i.e., the toolpusher. However, the toolpusher was right there on the scene examining the condition of the brakes. As stated earlier, although he was aware of the worn condition of two of the brake pads and that one of the brake bands was somewhat warped, he also believed that the primary cause of the brake's failure was that the driller had heated them up coming out of the hole. He tested the brakes once they were cleaned and found them working well. All of this information was relayed to Beard, along with Sonnier's opinion that it was safe to resume drilling. Although this may have amounted to an error in judgment on Sonnier's part, we are not going to impose upon Transworld a duty to countermand such a decision, absent evidence that there was some good reason why they should not have relied on the judgment of this particular toolpusher.

Finally, we do not find there was sufficient evidence that Dave Beard was a corporate officer or policymaker, which we believe is a necessary prerequisite in this Circuit to holding a corporation liable for punitive damages. *See McGuffie v. Transworld Drilling Co.,* 625 F.Supp. 369, 371 (W.D.La., 1985).

Plaintiff's counsel makes much of the Request For Purchase (RFP) dated April 1, 1985, wherein the new brake pads were ordered, on which the words "Rig Shut Down—Emergency Purchase" were written. (See Plaintiffs' Ex. 7.) The RFP date is shown as April 1, 1985. The order also indicates it was confirmed with the vendor on March 31, 1985. There was no testimony by the person who prepared this order as to exactly when it was written. We think it very likely that it was prepared during the five and one-half hours that the rig was actually shut down, which would explain why the words "Rig Shut Down" appear on the order. That person might well have thought when he prepared the order form that the rig might have to remain shut down until the order was received. But we will not accept what the preparer might have thought as persuasive evidence that the toolpusher acted recklessly in deciding not to shut down the drilling operation after all.

### III. *Corporate Veil*

■ Lastly, we are not persuaded by plaintiff's claim that Kerr–McGee is the alter ego of Transworld and that Transworld's corporate veil should be pierced. Plaintiff did not make the kind of showing necessary to hold a parent corporation liable for the debts of its subsidiary. While there was certainly a great deal of control exercised by Kerr–McGee over its subsidiary, Transworld, there was no showing that Kerr–McGee failed to observe the formalities of separate incorporation, or that its control amounted to total domination of Transworld. *See Baker v. Raymond Intl., Inc.,* 656 F.2d 173 (CA5–1981).

### IV. *Damages*

■ After considering all of the evidence presented by both parties, including the testimony of plaintiff's and defendants' economic experts, regarding plaintiff's past and future wage loss, we conclude that an award of $90,000 for past wage loss and

$300,000 for future wage loss would fairly compensate plaintiff for these losses.

In arriving at these figures, we have taken judicial notice of the scarcity of jobs available in the oil industry at this time. We also note, however, that plaintiff was rated very highly by everyone who worked with him as to his ability and character. He moved up steadily from the time he was employed by Transworld, and there was simply no quarrel about his abilities as a driller or his willingness to work. Plaintiff demonstrated a willingness to go where he was needed, as evidenced by the time he spent in Indonesia, which was after he was married. Given his ambition and flexibility, we think it a fair assumption that, had he not suffered the injury to his wrist, he would have been able to continue working in the oil field on a more or less regular basis.

We further conclude that Michael Wilcox is entitled to an award of $100,000 for his 25% disability. Of this amount, $8,000 is to compensate him for his past disability, and $92,000 is to compensate him for his future disability.

We find credible the testimony of plaintiff and his wife that he has suffered and will continue to suffer a great deal of mental anguish over his inability to continue working offshore, and therefore award him $25,000 for past mental anguish and $25,000 for future mental anguish. For his past physical pain and suffering, we award him $25,000; for his future physical pain and suffering we award him an additional $25,000.

For the loss of consortium claims made by plaintiff's wife, we award a total of $10,000; $5,000 for her past loss and $5,000 for her future loss. We find no basis in the law to grant an award for the loss of consortium claim made by Michael Wilcox himself.

In summary, we find that plaintiffs' damages were a direct result of the negligence of Transworld Drilling and the unseaworthiness of its rig. We do not find sufficient evidence to warrant the imposition of puni-

tive damages. Therefore, we find the total damages in this case to be $600,000.