**UNITED STATES STEEL CORPORA-
TION, Appellant,**

v.

**Barbara J. FUHRMAN, Administratrix of
the Estate of Arthur J. Fuhrman,
Deceased, et al., Appellees.**

No. 18481.

United States Court of Appeals
Sixth Circuit.

March 7, 1969.

Lucian Y. Ray, Cleveland, Ohio, for appellant; Roman T. Keenen, McCreary, Ray & Robinson, Cleveland, Ohio, on brief.

Abraham E. Freedman, Philadelphia, Pa., and Arthur Roth, Miami, Fla., for appellees; Freedman, Borowsky & Lorry, Philadelphia, Pa., J. Harold Traverse, Cleveland, Ohio, on brief for Fuhrman, and others; Pressman & Scribner, New York City, on brief for Harry Bey and Rita Radtke, Administratrix of Estate of Reinhold Radtke; Frederick C. Stern, New York City, of counsel; Ned R. Phillips; Pressman & Scribner, New York City, Elmer L. Radka, Louis G. Jarboe, Rogers City, Mich., Victor G. Hanson, Kenneth C. Davies, Detroit, Mich., on brief for other appellees.

Before WEICK, Chief Judge, and PHILLIPS and PECK, Circuit Judges.

PHILLIPS, Circuit Judge.

In the Straits of Mackinac on May 7, 1965, the Steamship Cedarville, owned by the appellant (United States Steel) and the Norwegian Ship Topdalsfjord collided in a heavy fog. After approximately forty minutes the Cedarville sank, ten of her crewmen were lost and other crew members sustained personal injuries. Subsequently United States Steel filed a petition in the District Court for exoneration from or limitation of liability against the claimants, including the personal representatives of the deceased seamen. Similar petitions were filed by the owners of the Topdalsfjord and the Weissenburg, a German ship which was in close proximity to the collision.

After a period of extended pre-trial activity the parties agreed by stipulation that United States Steel and the Norwegian owner would accept liability for the compensatory damages and would pay full compensatory damages to all claimants, either by settlement or by award of a special commissioner. It was further stipulated that punitive damages, if any were found, would be adjudged against United States Steel alone. The unsettled claims for compensatory damages were submitted to a commissioner and the issue of liability for punitive damages was determined by the District Court. Compensatory damages have been settled or are in the process of being awarded completely independent of the appeal now presented to this Court.

After a rather lengthy trial the District Court held that United States Steel was liable to the claimants for punitive damages. The opinion of the District Court is published at Petition of Den Norske Amerikalinje A/S, 276 F.Supp. 163 (N.D. Ohio). For the reasons herein set forth, we cannot agree with this decision and accordingly reverse the judgment of the District Court.

The only question before the District Court and before this Court is whether or not punitive damages should be assessed against United States Steel as owner of the Cedarville. Reference is made to the published opinion of the District Judge for a detailed statement of facts, which will not be repeated in this opinion except to the extent necessary to dispose of the issues presented on appeal.

United States Steel operated a radio network from its offices in Pittsburgh,

Pennsylvania, to all the vessels in its entire fleet on the Great Lakes, known as the Bradley Fleet. Almost immediately after the collision the master of the Cedarville, Captain Joppich, contacted the Pittsburgh offices by radio advising that a collision had taken place. In turn Captain Parrilla, the manager of the Bradley Fleet, was informed that the Cedarville had been involved in a collision and was seriously holed and taking water. The manager, Captain Parrilla, did not contact the Cedarville by radio.

Immediately after the collision Captain Joppich of the Cedarville sounded a general alarm and sent a May Day. Within a very few minutes he made a decision to beach the vessel rather than abandon ship. This proved to be a disastrous error in judgment, since the ship capsized during its attempted run for the beach and ten crewmen were drowned and others injured.

As one of two major bases for awarding punitive damages the District Court found the failure of the officials of the Bradley Fleet to intervene and countermand the order of Captain Joppich to beach the Cedarville was in callous disregard of the duty of United States Steel to the crewmen. The second major basis for punitive damages was the finding that it was common practice for the officials of the Bradley Fleet to order its ships to proceed at full speed ahead in the fog and to deviate from recommended courses published by the United States Coast Guard for ship traffic in the Straits of Mackinac.

United States Steel argues that the clearly erroneous standard as set out in Rule 52(a) of the Fed.R.Civ.P. is inapplicable where the entire record in the trial court consisted of depositions, the reading of various portions of Coast Guard investigation records and other written evidence and there was no testimony by live witnesses. The reasoning urged in support of this view is that since the trial judge did not see the witnesses testify and observe their demeanor, he is in no better position to judge their credibility than the reviewing court. It is argued that this Court therefore should not be bound by the clearly erroneous standard in reviewing the findings of fact of the trial judge.

There is authority for this contention. See, e.g., Kuhn v. Princess Lida of Thurn and Taxis, 119 F.2d 704 (3d Cir.) and Frazier III v. Alabama Motor Club, Inc., 349 F.2d 456 (5th Cir.). Our research reveals a split of authority among Circuits on this point as well as a conflict in some of the earlier decisions of this Court. This Court was faced with an analogous situation in the case of Commissioner of Internal Revenue v. Spermacet Whaling and Shipping Co., 281 F.2d 646 (6th Cir.), where the conflict among earlier decisions is discussed. The late Judge Shackelford Miller, with the concurrence of Judge O'Sullivan, said at page 651:

"We recognize that there are a number of decisions in several of the circuits, including our own, which hold that where the subsidiary facts are undisputed and no question of credibility is involved, the Court of Appeals is as well qualified as the trial judge to draw inferences and conclusions therefrom, and such inferences and conclusions of the trial judge can be reviewed by the Court of Appeals free of the limitation of the 'clearly erroneous' rule. Seagrave Corp. v. Mount, 6 Cir., 212 F.2d 389, 394; E. H. Sheldon & Co. v. Commissioner of Internal Revenue, 6 Cir., 214 F.2d 655, 658. However, in Rich v. Pappas, 6 Cir., 229 F.2d 308, 313, we concluded that in view of the ruling of the Supreme Court in United States v. United States Gypsum Co., supra, 333 U.S. 364, 394, 68 S.Ct. 525, 92 L.Ed. 746, the conclusions of the trial judge, even though drawn from undisputed facts, were findings of fact which were not to be set aside unless clearly erroneous. We followed this new ruling, with one judge dissenting, in Dixie Sand & Gravel Corp. v. Holland, 6 Cir., 255 F.2d 304, 308, 314, and again in Commissioner of Internal Revenue v. Consolidated Premium Iron Ores,

Ltd., supra, 6 Cir., 265 F.2d 320, 326. However, some members of the Court have been of the opinion that the rule as stated in the earlier Seagrave Corp. and E. H. Sheldon & Co. cases was the correct and better rule and have followed it in recent cases. Yunker v. Commissioner of Internal Revenue, 6 Cir., 256 F.2d 130, 133; Gudgel v. Commissioner of Internal Revenue, 6 Cir., 273 F.2d 206, 209–210."

In the present case the District Judge conducted a trial extending over a period of approximately four weeks and heard voluminous testimony in the form of depositions, Coast Guard records, and other written material. Upon the basis of this evidence he made findings of fact. We adhere to the conclusion stated by Judge Miller, speaking for the majority in *Spermacet, supra,* and hold that the findings of fact of the District Judge are not to be set aside by this Court unless they are clearly erroneous. We conclude that Rule 52(a) applies to the findings of fact of the District Judge in the present case notwithstanding that he heard no live testimony at the trial. Commissioner of Internal Revenue v. Duberstein, 363 U.S. 278, 291, 80 S.Ct. 1190, 4 L.Ed.2d 1218; United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 92 L. Ed. 746.

In reviewing the record in the present case we accordingly apply the clearly erroneous standard. In United States v. United States Gypsum Co., *supra,* the Supreme Court said:

"A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." 333 U.S. at 395, 68 S.Ct. at 542.

After a careful review of the record, we hold that the findings of the District Judge to which we have referred above and upon the basis of which the District Court awarded punitive damages against United States Steel are clearly erroneous.

The record fails to disclose evidence to the effect that it was standard procedure for United States Steel to order its vessels to ignore the recommended courses of navigation in this area. Nor do we find support in the record that United States Steel, as a matter of general practice, ordered its ships to proceed full speed ahead in a heavy fog. The only significant evidence in support of these findings is the self-serving statements of Captain Joppich of the Cedarville. There is nothing to indicate that these were authorized procedures dictated by the officials of United States Steel. The isolated action of Captain Joppich does not support a finding that United States Steel knew of this deviation, much less ordered it. We hold that even if the collision would not have occurred except for deviation from Coast Guard recommended compass headings, there is still insufficient support in the record for an award of punitive damages against United States Steel.

The record shows that the Cedarville was a self-unloader and was not constructed with water-tight compartments. Water which entered any one of the compartments would run throughout the entire length of the hull. The evidence indicates that there are many ships on the Great Lakes with similar construction. The District Judge found that with this knowledge of the construction of the Cedarville, Captain Parrilla, manager of the Bradley Fleet, knew with certainty that the attempt to beach the ship would fail, once he had learned that the Cedarville was seriously holed and taking water.

It was further found by the District Judge that Captain Parrilla learned of the decision to beach the Cedarville prior to its sinking. Although the record is unclear on this point, we cannot say that this finding was clearly erroneous. However, we find no support in the record for the conclusion that Captain Parrilla or any other official of United States Steel knew the full extent of the seriousness of the situation or

that the beaching attempt was a "certain failure." With wisdom borne of retrospect we now can look back and see that the attempt to beach the vessel was a tragic error in judgment on the part of the master of the Cedarville. We are not prepared to hold, however, that company officials sitting hundreds of miles away had the obligation under the facts of the case to make a decision as to the best course of action to be taken and to countermand the orders of the master who was on the scene and in the middle of the emergency.

The relationship of the ship master and the authority and control he exercises over his ship in such emergencies is unique. In order to avoid chaos aboard in such situations it is imperative that the vessel remain under the control of a single individual with complete and undisputed authority. The master of the vessel must assume authority in such a crisis and he has the responsibility to make the final decision as to what the proper course of action must be in view of all the factors concerned. To hold otherwise would result in hesitations and disastrous delays on the part of the master while he obtains advice and authority from his superiors many miles from the scene. On this very point the Supreme Court in Columbian Insurance Co. v. Ashby and Stribling, 38 U.S. (13 Pet.) 331, 344, 10 L.Ed.2d 186, speaking through Mr. Justice Story, said:

> "Indeed, in many, if not most, of the acts done on these melancholy occasions, there is little time for deliberation or consultation. What is to be done, must often, in order to be successful, be done promptly and instantly by the master, upon his own judgment and responsibility. The peril usually calls for action, and skill, and intrepid personal decision, without discouraging others by timid doubts or hesitating movements."

The master of the Cedarville chose what he thought was the best course of action under the circumstances for the benefit of all concerned. There is no evidence that he exercised other than good faith when he made his decision to beach the Cedarville. Most of the members of the crew whose lives depended on his decision were his neighbors in Rogers City, Michigan.

The District Court emphasized that another ship, the Weissenburg, was standing by and offered to take aboard the entire crew of the Cedarville. It is entirely feasible that in the strain and crisis of the collision, Captain Joppich thought that a decision to abandon ship and undertake to transfer his men to the Weissenburg would be more dangerous to his crew than an attempt to beach the ship, since he did not know the exact whereabouts of the other ships in the heavy fog in the immediate vicinity. The result of a decision to abandon ship will remain a matter of conjecture. It would have been practically impossible for United States Steel officials sitting in Pittsburgh to have known the situation as well as did Captain Joppich. This is not to say under the same conditions others might not have made a different decision.

In United Geophysical Co. v. Vela, 231 F.2d 816, 819, (5th Cir.) the Court was faced with the problem of reviewing the actions of the master long after the emergency had passed. The reasoning of the Court is particularly applicable in the case before us:

> "But navigation in these circumstances is left neither to Judges nor the Elder Brethren of Trinity House nor those who, in the garb of experts, from the security of a swivel chair now lay out the course with great conviction. 'The master is the commander of the ship—lord of his little world. He is master in every sense of the word * * *'. The Balsa, 3 Cir., 10 F.2d 408, 409. Whether he has bridge or quarterdeck to stalk, as long as he commands, he is master. It is the Master, then, who must make these decisions and who, clothed with great responsibility, enjoys the greatest and widest of good faith latitude in professional judgment. 'The fundamental principle in navigating a mer-

chantman, whether in times of peace or of war, is that the commanding officer must be left free to exercise his own judgment. Safe navigation denies the proposition that the judgment and sound discretion of a captain of a vessel must be confined in a mental strait-jacket. * * *' The Lusitania, D.C.S.D.N.Y., 251 F. 715, 728."

It may be, as held by the District Court, that Captain Parrilla could have offered suggestions by radio to the master of the Cedarville as to what action might have been advisable. However, for Captain Parrilla or any other official of United States Steel to have rescinded the master's order to beach the vessel and to have ordered him to abandon ship, without having more knowledge than they possessed at the time, conceivably could have resulted in an even worse disaster. We cannot say that Captain Parrilla or other officials of United States Steel should have substituted their judgment for that of the master under the facts of this case. See The Princess Sophia, 61 F.2d 339 (9th Cir.).

■■ We think the better rule is that punitive damages are not recoverable against the owner of a vessel for the act of the master unless it can be shown that the owner authorized or ratified the acts of the master either before or after the accident. Punitive damages also may be recoverable if the acts complained of were those of an unfit master and the owner was reckless in employing him. Lake Shore and Michigan Southern Railway Co. v. Prentice, 147 U.S. 101, 13 S.Ct. 261, 37 L.Ed. 97; The Amiable Nancy, 16 U.S. (3 Wheat.) 546, 556–557, 4 L.Ed. 456; Pacific Packing & Navigation Co. v. Fielding, 136 F. 577 (9th Cir.).

■■ Even if we were to conclude that the actions of Captain Joppich were of such a nature as to warrant an award of punitive damages against him personally, we hold that the facts of this case would not permit this Court to affirm the judgment of the District Court imposing punitive damages upon United States Steel. As has been stated previously, the pre-collision actions of Captain Joppich were neither authorized nor ratified by United States Steel. Regarding post-collision events, we hold that the silence of United States Steel and failure to countermand the master's order to beach the vessel did not constitute ratification of his actions. There was no duty for the owner to speak or otherwise interfere with the authority of the master of the vessel under these facts. Furthermore the evidence does not show that Captain Joppich was an unfit master. To the contrary, he was a 54-year old seasoned veteran with many years of experience in navigation on the Great Lakes and through the Straits of Mackinac.

For reasons stated, we hold that the award of punitive damages against United States Steel was error. Our decision will have no effect upon the awarding of compensatory damages to the various claimants.

In view of our disposition of the case we find it unnecessary to decide the other issues raised by the parties on this appeal.

Reversed and remanded.

JOHN W. PECK, Circuit Judge (concurring).

I concur with my brethren that the findings upon which the District Court awarded punitive damages against United States Steel Corporation are clearly erroneous, but since we are thus unanimously agreed that the findings do not even reach the level which would require us to permit them to stand under Rule 52(a) it seems to me superfluous to consider whether they could meet less exacting tests. The majority opinion indicates the split of authority existing among Circuits as well as that reflected in some of the decisions of this Court concerning the review of cases in which live witnesses have not been heard and where the trier of the facts considered only the identical documentary record presented to the appellate body. I see

no reason to here reaffirm a conclusion indicated but not discussed by a divided court in Commissioner of Internal Revenue v. Spermacet Whaling and Shipping Co., 281 F.2d 646 (6th Cir. 1960), and would prefer to remain free to consider the issue in a case which does not rise to the clearly erroneous level.