872 F.2d 642
 1989 A.M.C. 2447, 57 USLW 2685
 In the Matter of P & E BOAT RENTALS, INC., Plaintiff.
Cheryl Daphne FUSSELMAN, etc., Plaintiff-Appellee-Cross-Appellant,
and
Insurance Company of North America, Intervenor-Appellee,
v.
ENNIA GENERAL INSURANCE COMPANY, INCORPORATED, et al.,
Defendants-Third Party
Defendants-Plaintiffs-Cross-Appellants,
and
Brigette Stockstill, etc., Defendant-Third Party
Plaintiff-Appellee Cross-Appellant.
Karen Walker BOULAS, et al, Defendants and Third Party
Plaintiffs-Appellees-Cross-Appellants,
v.
David STOUFFLET and Prentiss G. Stockstill, Plaintiffs and
Third Party Defendants-Appellees-Cross-Appellants,
v.
CHEVRON, USA, INCORPORATED, Third Party
Defendant-Appellant-Cross-Appellee.
 No. 87-3372.
 United States Court of Appeals,
Fifth Circuit.
 May 10, 1989.
Rehearing and Rehearing En Banc Denied June 22, 1989.
 
 Neal D. Hobson, Bruce R. Hoefer, Jr., Stephen C. Carleton, Milling, Benson, Woodward, Hillyer, Pierson & Miller, New Orleans, La., for Chevron.
 John R. Martzell, Scott R. Bickford, Martzell, Lamothe & Gay, New Orleans, La., for Fusselman.
 Wood Brown, III, Montgomery, Barnett, Brown, New Orleans, La., for Ins. Co. of North America.
 Rufus C. Harris, III, Bernard P. McSherry, Jr., Jacob Shisha, Terriberry, Carroll & Yancey, New Orleans, La., for Ennia.
 Stewart E. Niles, Jr., Glen Goodier, Gino J. Rendeiro, John R. Peters, Jones, Walker, Waechter, Poitevent, New Orleans, La., for Stockstill.
 Paul R. Miller, Robert A. Chaffin, G. Robert Friedman, Houston, Tex., Stephen B. Murray, New Orleans, La., for Boulas, et al.
 John M. Robin, Covington, La., Darryl J. Tschirn, Metairie, La., for Stoufflet.
 Appeals from the United States District Court for the Eastern District of Louisiana.
 Before JOHNSON, DAVIS and JONES, Circuit Judges.
 W. EUGENE DAVIS, Circuit Judge:
 
 
 1
 The litigation that spawned this appeal arose from a collision between two crewboats, the MARIE ELISE and the MISS BRIDGET. The owners of the two vessels filed limitation of liability proceedings in which the injury and death claimants filed counter claims. Those claimants also cross-claimed against Chevron, the time-charterer of the MARIE ELISE, and filed separate suits against Chevron and others. Judgment was rendered against a number of defendants; of those defendants, Chevron alone appeals. The plaintiffs cross-appeal but limit their complaint to the court's refusal to award prejudgment interest. With one exception, we affirm the award of compensatory damages and denial of prejudgment interest, but we vacate the award of punitive damages.
 
 
 2
 I. STATEMENT OF FACTS AND PROCEDURAL HISTORY
 
 A.
 
 3
 This case arises out of a tragic collision in heavy fog between two vessels, the MISS BRIDGET and the MARIE ELISE on January 31, 1983 at 2:00 p.m. The collision occurred on the Mississippi River near its intersection with the Jump, a local name for Grand Pass, which empties into the river through its west bank, south of Venice, Louisiana.
 
 
 4
 The MARIE ELISE was a forty-six foot crewboat owned and operated by P & E Boat Rentals, Inc. (P & E). Her skipper, Louis Barrios, was employed by P & E. The MISS BRIDGET was a thirty-three foot crewboat owned by Stoufflet, Inc., with its president, David Stoufflet, serving as captain on the day of the accident. The MARIE ELISE was under time-charter to Chevron, Inc. and the MISS BRIDGET was orally time-chartered to Coastline Construction Company, Inc.
 
 
 5
 Earlier in the day--at approximately 6:00 a.m.--Captain Barrios and the MARIE ELISE departed from Chevron's Venice base, located on the Jump, near its juncture with the Mississippi River, to deliver a work crew to the Chevron work facility in the Southwest Pass in the lower Mississippi River. Around noon, Wilton Moses, a Chevron construction foreman, learned that a platform had been completed near Southwest Pass and that Chevron needed to install a navigation aid on that structure. Moses dispatched the MARIE ELISE to the Venice base to pick up the navigation aid and bring it back to the W-2 work area for ultimate transportation downstream to the new platform.
 
 
 6
 Barrios followed these instructions, departed Southwest Pass and arrived at the Jump at approximately 1:00 p.m. Barrios encountered considerable fog in the Mississippi River during this trip, some of which was heavy. Barrios had the navigation aid loaded aboard the MARIE ELISE and departed the Venice base at approximately 2:00 p.m. Although the evidence was conflicting, the district court found that Barrios made this trip under protest because of heavy fog. The court also found that Moses pressured Barrios to return from Venice quickly so that the MARIE ELISE would be available to make her regular run to transport the work crews.
 
 
 7
 At the same time that Barrios departed the Venice base at the Jump, Captain Stoufflet was piloting the MISS BRIDGET northbound, favoring the west bank of the Mississippi River, and approaching the Jump. Due to unusually low tides, the MISS BRIDGET's time-charterer had halted its offshore operation for the day and the MISS BRIDGET was transporting an eight member work crew back to shore. The MISS BRIDGET was proceeding dead slow in the fog, but without a functioning radio.
 
 
 8
 When Barrios, piloting the MARIE ELISE, reached the point where the Jump intersected the Mississippi River, he announced his intention on his radio to "shoot across" to the east bank of the river. When he received no protest to his plan from vessels in the area, Barrios put his engine at 3/4 speed and proceeded rapidly across the river. Unfortunately, the northbound MISS BRIDGET was in the MARIE ELISE's path. The MARIE ELISE collided with the port side of the MISS BRIDGET, a few feet aft of her bow, and went partially over the top, coming to rest on top of the MISS BRIDGET. Four passengers on the MISS BRIDGET were killed, and five others aboard that vessel, including its skipper, were seriously injured. The MISS BRIDGET was rendered a total loss. Barrios, the only person aboard the MARIE ELISE, was uninjured.
 
 B.
 
 9
 Within a month of the collision, P & E Boat Rentals, Inc., owner of the MARIE ELISE, and Stoufflet, Inc., owner of the MISS BRIDGET, petitioned the district court for exoneration from or limitation of liability pursuant to 46 U.S.C.App. Sec. 183, et seq. The personal injury and death claimants asserted claims in those proceedings and cross-claimed against Chevron and others. These claimants also filed separate actions against their employers under the Jones Act, and against Chevron and others under the general maritime law.
 
 
 10
 The district court empaneled a jury to hear the actions triable by jury. At trial, the court heard the same evidence that was presented to the jury to resolve the non-jury claims. In a trifurcated proceeding, the jury found that David Stoufflet and the MISS BRIDGET were not responsible for the collision and assigned 45% of the fault to Chevron; 35% to Louis Barrios, captain of the MARIE ELISE, and 20% to Paul Gibson, the owner of that vessel. In the second phase of the proceeding, the jury found Chevron's acts grossly negligent and reckless, and returned a verdict for $16,000,000 in punitive damages against Chevron. In the final stage of the trial, the jury returned a verdict in favor of the claimants in various amounts for compensatory damages. The district court entered findings of fact and conclusions of law that mirrored the jury's verdict.
 
 
 11
 The district court ruled that all the personal injury and death claimants, except Fusselman, were entitled to a jury trial on the claims they asserted in their independent actions. Fusselman, who sued only Chevron, acknowledged that she was not entitled to a jury trial. The district court was the trier of fact as to liability and damages in her general maritime law claim, but the court nonetheless permitted the jury, in an advisory capacity, to hear this same claim. The district court also made independent findings on all issues presented to the jury. Although Chevron challenged in the district court the right of the claimants to a jury trial, Chevron does not contest that ruling on appeal.[1] Thus, whether the claimants were entitled to a jury trial on the maritime actions against Chevron is not before this court.
 
 
 12
 On review, we will uphold a trial judge's factual determinations unless they are clearly erroneous. Marathon Pipeline Co. v. M/V SEA LEVEL II, 806 F.2d 585, 589 (5th Cir.1986). We will uphold a jury's factual findings unless "the facts and inferences point so strongly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict ..." Boeing Co. v. Shipman, 411 F.2d 365, 374 (5th Cir.1969) (en banc).
 
 
 13
 Following the trial, the jury and the district court found that Barrios, as captain of the MARIE ELISE, was negligent in several respects: operating the vessel without a Coast Guard license; operating a vessel at an excessive rate of speed under operating conditions of restricted visibility; failing to sound proper fog signals; and failing to properly monitor the vessel's radar. With respect to Chevron, the court and jury found Chevron at fault for negligently allowing unlicensed captains to operate vessels in the Venice field and because Wilton Moses, a Chevron field foreman, directed Barrios to make the trip in question: 1) with knowledge that dense fog was present; and 2) knowing that it would be necessary for Barrios to operate the vessel at high speed in order to return to the Chevron base in time to make the regular crew run. The court and jury also found that such orders by Chevron foremen were common in the Venice field. Although the district court characterized the above practices as part of the Chevron corporate policy, it did not identify anyone other than foremen assigned to the Venice area who had knowledge of this conduct.
 
 
 14
 The district judge and the jury found that Chevron's conduct was willful and wanton and imposed punitive damages against Chevron. The award against Chevron and its co-defendants for compensatory damages was $6,000,000. The punitive damage award against Chevron, alone, was for $16,000,000.
 
 
 15
 Chevron appeals the district court's assessment of both liability and damages; no other defendants appeal this judgment. The plaintiffs cross-appeal on the sole issue of prejudgment interest.
 
 
 16
 II. CHEVRON'S LIABILITY FOR COMPENSATORY DAMAGES
 
 A.
 
 17
 Chevron first argues that the decision below cannot stand because a time charterer is not responsible for the unseaworthiness and operational negligence of the vessel it charters. We agree that a time charterer "who has no control over the vessel, assumes no liability for negligence of the crew or unseaworthiness of the vessel absent a showing that the parties to the charter intended otherwise." Mallard v. Aluminum Co. of Canada, Inc., 634 F.2d 236, 242 n. 5 (5th Cir.), cert. denied, 454 U.S. 816, 102 S.Ct. 93, 70 L.Ed.2d 85 (1981). However, this general rule does not exempt a time charterer from liability if it is negligent in conducting its activities as time charterer. In Graham v. Milky Way Barge, Inc., 811 F.2d 881 (5th Cir.1987), we upheld a judgment against Chevron, which was there, as here, found negligent, not as owner or operator of a vessel, but as time charterer. Our reasoning in Graham applies with equal force to this case:
 
 
 18
 Chevron cites many cases, both in this Circuit and others, where the time charterer was not held liable for the unseaworthiness of a chartered vessel or the negligence of its crew. Chevron's argument, however legally sound it may be, is inapposite to the findings by the district court. The district court found not that Chevron was responsible for any unseaworthiness of the vessel or negligence on the part of the crew but that Chevron's negligence was independent of any arising from the maintenance and operation of the [vessel].
 
 
 19
 811 F.2d at 892-93. Here, the district court granted Chevron's motion to dismiss the claims against it which sought to impose liability against Chevron for the unseaworthiness of the MARIE ELISE or its negligent operation. The jury and the district court nonetheless eventually held Chevron liable because of its own negligent acts, including the demand by Moses that Barrios operate the MARIE ELISE at high speeds in heavy fog. The district court did not err in imposing liability against Chevron on this ground and in denying Chevron's motion for directed verdict and judgment notwithstanding the verdict.
 
 B.
 
 20
 Chevron next contends that the record does not support the district court's finding that, on January 31, 1983, Chevron's field foreman required Barrios, the skipper of the MARIE ELISE, to operate the vessel at excessive speeds in heavy fog. A careful review of the record persuades us that these findings are supported by substantial evidence and are not clearly erroneous.
 
 
 21
 The record supports the findings of the court and jury that Moses directed Barrios to make the run from the Venice area base to the platform in Southwest Pass and that portions of the river were enshrouded in heavy fog. The factfinder was also entitled to infer that Moses either explicitly or implicitly conveyed to Barrios his desire that Barrios complete this assignment in time to transport the regular contract crew home. The court and jury were entitled to find that Moses was negligent in giving such an order to Barrios under the existing weather conditions. Plaintiffs produced the testimony of a number of boat owners and operators who previously worked in the Chevron Venice area. They testified generally that the Chevron foremen in the field regularly required boat operators to make high speed runs in heavy fog.[2] They also testified that boat operators who refused to honor such requests were frequently replaced when Chevron complained to the boat owner. Under these circumstances, the factfinder was entitled to conclude that Barrios was justified in believing that his job was in jeopardy if he did not make the high speed run requested of him by Moses. In short, the evidence amply supports the finding of the court and jury that Moses was negligent in requiring Barrios to make the high speed run in heavy fog and that Barrios was justified in believing that if he did not make the run as requested, his job would be in jeopardy.
 
 C.
 
 22
 Chevron next argues that the district court and jury's allocation of 0% fault to the MISS BRIDGET and her captain, Stoufflet, is not supported by the record. Chevron contends that Stoufflet was at fault for operating the MISS BRIDGET in heavy fog without a radio, and in slowing the vessel when he observed the MARIE ELISE on radar as she entered the river.
 
 
 23
 However, Stoufflet offered testimony which, if believed, disputed Chevron's version of the accident. Captain Stoufflet testified that before he departed from the landing he thoroughly checked his vessel, including the radio, which operated properly. Inexplicably, the radio stopped working during the trip to Venice. Captain Stoufflet had no opportunity to repair the radio in the middle of the trip, and continued on to Venice, travelling at slow speed and sounding his fog horn. Moreover, the district court was entitled to conclude that a radio is not considered a critical part of the vessel's navigational equipment. Stoufflet also testified that he slowed his boat when he hit heavy fog and maintained this dead slow speed (approximately 5-6 miles per hour), after spotting the MARIE ELISE on radar. The record amply supports the factual determination that Stoufflet was reasonable both in slowing his vessel when he encountered heavy fog, and in maintaining that speed.
 
 D.
 
 24
 Chevron challenges the propriety of several compensatory damage awards: (1) the award to Captain David Stoufflet for lost earnings is excessive; (2) Anna Mae Boulas was entitled to no recovery because she was not dependent on the decedent David Boulas; and (3) pain and suffering awards to the estates of Shane Stockstill and Gerald Fusselman were improper because the evidence is insufficient to support a finding that the decedents survived the impact of the collision. We review each of these claims below.
 
 1.
 
 25
 The jury awarded Stoufflet $645,000 in total damages, which included $75,000 for past lost earnings, $175,000 for future lost earnings, $250,000 for past and future conscious pain and suffering, and $145,000 for past and future mental pain and suffering. Chevron argues that the $175,000 lost future earnings award is a disguised award for lost profits which are not recoverable where a vessel is a total loss. We agree that "in cases of total loss [of a vessel] the probable profits of a charter, not yet entered upon, are always rejected." THE UMBRIA, 166 U.S. 404, 421, 17 S.Ct. 610, 617, 41 L.Ed. 1053 (1897); Barger v. Hanson, 426 F.2d 640, 641 (9th Cir.1970). The reason for this rule is succinctly stated in Barger, 426 F.2d at 624, quoting THE HAMILTON, 95 F. 844, 845 (E.D.N.Y.1899):
 
 
 26
 "[T]he law does not consider that the sunken ship is incapable of replacement. It rather considers that ships are commodities bought and sold in the market, and that one may be purchased to take the place of one lost, and that, even if there be delay, the interest in the money compensates for any loss thereby.
 
 
 27
 Here, Stoufflet could purchase a new vessel, from which he could receive future profits.
 
 
 28
 Stoufflet defends the jury's award, arguing that the damages for lost future earnings were not based on the lost profits of his vessel. He notes that he fractured a leg, tore ligaments in his knee joint, and underwent both facial surgery and a spinal fusion of two cervical discs. We agree that Stoufflet obviously has some lost earning capacity. This lost capacity, however, should be measured by wages Stoufflet would have been required to pay a qualified boat captain to operate Stoufflet's vessel during his disability, or by wages Stoufflet could reasonably have expected to earn by operating another boat owner's vessel. See, e.g., Deakle v. John E. Graham & Sons, 756 F.2d 821, reh'g denied, 763 F.2d 419 (11th Cir.1985) (in determining proper award for lost future wages, factfinder should determine what uninjured plaintiff would have earned and then subtract what the injured plaintiff's actual earnings would be). At trial, Stoufflet's expert economist computed Stoufflet's loss of earning potential by projecting revenues of Stoufflet, Inc., during Stoufflet's estimated period of disability. Because Stoufflet's award for lost earnings was partially based on the profits of the MISS BRIDGET, we vacate this award with directions to the district court to reconsider it on remand in light of this opinion.
 
 2.
 
 29
 Next, Chevron contests the award of $67,000 to Anna Mae Boulas, representing $15,000 for loss of society, $42,000 for loss of support and $10,000 for loss of services. Chevron alleges that Mrs. Boulas cannot recover for loss of society because the decedent, her son, was survived by a spouse. See Sistrunk v. Circle Bar Drilling Co., 770 F.2d 455, 460-61 (5th Cir.1985), cert. denied, 475 U.S. 1019, 106 S.Ct. 1205, 89 L.Ed.2d 318 (1986). However, "[w]here a family unit is maintained by dependence on a single family member, each of the dependents may recover for their losses in a ... wrongful death claim under general maritime law." Complaint of Patton-Tully Transp. Co., 797 F.2d 206, 213 (5th Cir.1986).
 
 
 30
 Chevron challenges the district court's determination that Anna Mae Boulas was dependent on her son, David Boulas, for support. More particularly, Chevron contends that the contributions Anna Mae Boulas received from her son were inadequate to render her "dependent" on him for support. The standard for dependency under the general maritime law death remedy has not been established. Dependency is established under the Longshore and Harbor Workers' Compensation Act "[w]here the contributions are made for the purpose and have the result of maintaining or helping to maintain the dependent in his customary standard of living." U.S. Fidelity & Guaranty Co. v. Britton, 188 F.2d 674, 675 (D.C.Cir.1951). In Petition of United States, 418 F.2d 264, 271 (1st Cir.1969), the court adopted the above standard for dependency under the Death on the High Seas Act. Because the Supreme Court has expressly left unresolved the determination of beneficiaries entitled to recover in wrongful death actions under general maritime law, Moragne v. States Marine Lines, 398 U.S. 375, 408, 90 S.Ct. 1772, 1791, 26 L.Ed.2d 339 (1970), we look to the analogous death act, the Death on the High Seas Act, for guidance. We conclude that the record provides substantial evidence that Mrs. Boulas was dependent on her son for support. He contributed approximately $150 to $175 a month to her support. This consisted of cash contributions along with groceries, medication, and sewing supplies which he purchase for her. Other than a monthly disability check, David Boulas was his mother's only source of support. We decline to disturb this award.
 
 3.
 
 31
 Chevron also challenges the award of $25,000 to Shane Stockstill's survivors and the award of $40,000 to Gerald Fusselman's survivors for their conscious pain and suffering after the collision and before their death. Chevron argues that the evidence does not support the district court's finding that these men survived the impact of the boat collision. The district judge, however, concluded that "[t]estimony and evidence presented at trial indicated that Shane Stockstill and Gerald Fusselman were aware of their predicaments and that their deaths by drowning were not instantaneous." The finding is not clearly erroneous.
 
 
 32
 Competent evidence was presented at trial tending to show that Fusselman was conscious before going overboard. Immediately before the collision, P.G. Stockstill was standing in the cabin with Captain Stoufflet, Shane Stockstill and Gerald Fusselman. P.G. Stockstill and Fusselman were both seated. After the collision, the cabin was knocked off the vessel and submerged under water. P.G. Stockstill stated that he was able to swim out of the front cabin and struggle to the surface. He also stated, somewhat ambiguously, that he saw Shane Stockstill conscious after the collision. Moreover, the coroner testified that Shane Stockstill died of drowning and that there was no evidence of a penetrating injury which might have rendered Shane Stockstill unconscious.
 
 
 33
 The record also supports the factfinder's conclusion that Fusselman was conscious after the collision. P.G. Stockstill was talking with Fusselman before the collision. As with Shane Stockstill, the coroner testified that Fusselman died of drowning and that there was no evidence of pre-death blows to the head to suggest that Fusselman had been rendered unconscious. While the evidence is not overwhelming, the award for conscious pain and suffering to the survivors of Fusselman and Stockstill is not clearly erroneous.
 
 III. THE AWARD OF PUNITIVE DAMAGES
 
 34
 Chevron also challenges the $16 million award of punitive damages as unsupportable under the general maritime law. Chevron argues that the wanton acts of its field foremen cannot be imputed to Chevron to render it liable for punitive damages.
 
 
 35
 In The Complaint of Merry Shipping, Inc., 650 F.2d 622 (5th Cir.1981), we held that punitive damages are recoverable under the general maritime law where a defendant is shown to have engaged in willful and wanton conduct. But we have not considered whether a principal is liable for punitive damages when the wanton conduct is committed by an agent. We now turn to that question.
 
 
 36
 The courts are sharply divided over whether, and under what circumstances, a principal is liable for punitive damages for the conduct of an agent or servant when a principal has neither authorized nor ratified its servant's acts. A majority of courts have held "that the vicarious liability of the master for acts within the scope of employment extends to punitive as well as compensatory damages, even in the absence of approval or ratification ..." American Society of Mechanical Engineers v. Hydro Level Corp., 456 U.S. 556, 575 n. 14, 102 S.Ct. 1935, 1947 n. 14, 72 L.Ed.2d 330 (1982), citing W. Prosser, Law of Torts 12 (4th ed.1971). A number of courts, however, follow the Restatement of Torts and limit the circumstances in which the principal must respond in punitive damages for the acts of an agent. See Restatement (Second) of Torts Sec. 909.[3]
 
 
 37
 Most admiralty courts have taken an even more restrictive view of the principal's liability for punitive damages for the acts of an agent; those courts generally hold that the principal is liable in punitive damages only if it authorizes or ratifies wanton actions of an agent.
 
 
 38
 The Supreme Court first addressed the master's liability for punitive damages for the wanton acts of an agent in an admiralty case, THE AMIABLE NANCY, 16 U.S. (3 Wheat) 546, 4 L.Ed. 456 (1818). The owner of THE AMIABLE NANCY sued the owner of the private armed American vessel SCOURGE for compensatory and punitive damages arising out of a marine trespass. The crew of the SCOURGE boarded THE AMIABLE NANCY, robbed its crew of money, equipment and papers, and physically abused the crew members. Because THE AMIABLE NANCY proceeded on her voyage without papers, the Britannic Majesty's guard-brig seized the vessel upon her arrival in Antigua.
 
 
 39
 Although the Court readily imposed compensatory damages against the owner of the SCOURGE, it absolved the defendant vessel owner of liability for punitive damages:
 
 
 40
 Under the facts disclosed in the evidence, this must be pronounced a case of gross and wanton outrage, without any just provocation or excuse. Under such circumstances, the honor of the country and the duty of the court equally require that a just compensation should be made to the unoffending neutrals, for all the injuries and losses actually sustained by them. And if this were a suit against the original wrong-doers, it might be proper to go yet farther, and visit upon them in the shape of exemplary damages, the proper punishment which belongs to such lawless misconduct. But it is to be considered, that this is a suit against the owners of the privateer, upon whom the law has, from motives of policy, devolved a responsibility for the conduct of the officers and crew employed by them, and yet, from the nature of the service, they can scarcely ever be able to secure to themselves an adequate indemnity in cases of loss. They are innocent of the demerit of this transaction, having neither directed it nor countenanced it, nor participated in it in the slightest degree. Under such circumstances, we are of the opinion that they are bound to repair all of the real injuries and personal wrongs sustained by the libelants, but they are not bound to the extent of vindictive damages.
 
 
 41
 16 U.S. at 558-59.
 
 
 42
 Seventy-four years later, the Supreme Court affirmed these punitive damage principles in Lake Shore & Michigan Southern Railway Co. v. Prentice, 147 U.S. 101, 13 S.Ct. 261, 37 L.Ed. 97 (1893). In Lake Shore, a non-admiralty case, the Court held that a principal
 
 
 43
 though of course liable to make compensation for injuries done by his agent within the scope of his employment, cannot be held liable for exemplary or punitive damages merely by reason of wanton, oppressive or malicious intent on the part of the agent.
 
 
 44
 147 U.S. at 107-08, 13 S.Ct. at 263.
 
 
 45
 Similarly, in U.S. Steel Corp. v. Fuhrman, 407 F.2d 1143 (6th Cir.1969), cert. denied, 398 U.S. 958, 90 S.Ct. 2162, 26 L.Ed.2d 542 (1970), the Sixth Circuit reversed an award of punitive damages against U.S. Steel Corp., the owner of the Steamship CEDARVILLE, which had collided with a Norwegian ship in heavy fog. Immediately after the collision, the captain of the CEDARVILLE decided to beach the vessel rather than abandon ship. The ship capsized during its attempted run for the beach and ten crewmen drowned.
 
 
 46
 The district court awarded the plaintiffs punitive damages under two theories of liability. First, the district court found that U.S. Steel acted with callous disregard for the CEDARVILLE's crewmen when U.S. Steel officials failed to countermand the captain's order to beach the CEDARVILLE. And second, the district court found that it was common practice for U.S. Steel officials "to order its ships to proceed at full speed ahead in the fog and to deviate from recommended courses published by the United States Coast Guard for ship traffic." 407 F.2d at 1145. The Sixth Circuit determined that both findings were clearly erroneous and stated:
 
 
 47
 There is nothing to indicate that these were authorized procedures dictated by the officials of United States Steel. The isolated action of [the captain] does not support a finding that United States Steel knew of this deviation, much less ordered it.
 
 407 F.2d at 1146. The court also stated:
 
 48
 We think the better rule is that punitive damages are not recoverable against the owner of a vessel for the act of the master unless it can be shown that the owner authorized or ratified the acts of the master either before or after the accident. Punitive damages also may be recoverable if the acts complained of were those of an unfit master and the owner was reckless in employing him.
 
 
 49
 407 F.2d at 1148, citing Lake Shore and THE AMIABLE NANCY. See also Muratore v. M/S SCOTIA PRINCE, 845 F.2d 347, 356 (1st Cir.1988); McGuffie v. Transworld Drilling Co., 625 F.Supp. 369 (W.D.La.1985).
 
 
 50
 The only other circuit court sitting in admiralty which has ruled on this question is the Ninth Circuit in Protectus Alpha Navigation Co. v. North Pacific Grain Growers, 767 F.2d 1379 (9th Cir.1985). In that case the Ninth Circuit approved the imposition of punitive damages against the owner of a dock terminal for the reckless conduct of its dock foreman. The plaintiff established in that case that a vessel caught fire while tied at the defendant's dock. Instead of controlling the fire, the defendant's foreman insisted on casting off the lines securing the vessel to the dock. The vessel drifted away from the dock and the firefighting equipment positioned there. At least one fireman left aboard the vessel was killed, another seriously injured and the vessel was ultimately destroyed. The Ninth Circuit, relying primarily on the Restatement of Torts Sec. 909, held that the defendant dockowner was properly cast for punitive damages because his foreman was a managerial employee acting in the course of his employment.
 
 
 51
 For reasons that follow, we agree with the position adopted by the Sixth Circuit in U.S. Steel v. Fuhrman which is more restrictive than the views on this question expressed by the Ninth Circuit in Protectus Alpha Navigation Co. First, the Sixth Circuit view is more faithful to the teaching of the Supreme Court in THE AMIABLE NANCY and Lake Shore & Michigan Southern Railway Co. v. Prentice. Second, we relied on these Supreme Court cases in The Complaint of Merry Shipping in determining that punitive damages are recoverable under the general maritime law. It is appropriate that we look to these same authorities to define the scope of the punitive damage relief that should be accorded under the general maritime law. See McGuffie, 625 F.Supp. at 373.
 
 
 52
 Next, the Fuhrman rule is consistent with our notion of the proper reasons for awarding punitive damages. Punitive damages are imposed to punish the wrongdoer and deter others from engaging in similar conduct in the future. W. Prosser, Law of Torts 9 (4th ed.1971). These objectives are not achieved when courts drop the punitive damage hammer on the principal for the wrongful acts of the simple agent or lower echelon employee. As McCormick states: "There would seem to be little justification for punishing the master for willfulness or wantonness of which the agent is alone guilty." C.T. McCormick, Handbook on the Law of Damages Sec. 80 at 282 (1935). See also Randy S. Parlee, Vicarious Liability for Punitive Damages: Suggested Changes in the Law Through Policy Analysis, 68 Marquette L. Rev. 27, 55-56 (1984).
 
 
 53
 We hold simply that punitive damages may not be imposed against a corporation when one or more of its employees decides on his own to engage in malicious or outrageous conduct. In such a case, the corporation itself cannot be considered the wrongdoer. If the corporation has formulated policies and directed its employees properly, no purpose would be served by imposing punitive damages against it except to increase the amount of the judgment.
 
 
 54
 Applying the facts found by the district court to the above principles, we conclude that the punitive damage award against Chevron cannot stand. The award was based primarily on the wanton acts of Wilton Moses, a Chevron construction foreman employed in the Venice area, and Joseph Oster, a Chevron transportation foreman in the Venice field. Neither of these foremen exercised policymaking authority. Although the record supports a conclusion that other foremen in Chevron's Venice area had required operators of vessels to make dangerous high speed runs on the Mississippi River in the fog, the evidence does not support an inference that Chevron policymaking officials were aware of this practice. Moses was a first level supervisor operating out of the remote Venice area. His principal duties consisted of supervising the independent contract construction crews performing work in the oil and gas fields Chevron operated in that area. Joseph Oster was also a first or second level superior whose responsibilities were limited to the Venice area. He selected the crewboats and other equipment for use in the Venice, Louisiana area, supervised maintenance personnel in the area, and had charge of bunkhouses and the feeding of personnel living in the field.
 
 
 55
 In summary, we vacate the award of punitive damages against Chevron which makes it unnecessary for us to consider the constitutional challenge to the $16 million award and whether P.G. Stockstill's punitive damages claim is time-barred.
 
 IV. THE TRIAL
 
 56
 Chevron contends that it was denied a fair trial because of the disorderly, biased procedures the district court used. Chevron's complaints include the following: the district court permitted multiple counsel for plaintiffs to question witnesses and to argue to the jury; arguments by plaintiffs' counsel were inflammatory; plaintiffs' counsel used improper hypothetical questions; the trial judge denied Chevron the opportunity to cross-examine Freddie Collette, a hostile witness; the trial judge erroneously denied Chevron indemnity from P & E Boats; and the trial judge did not enforce pretrial order provisions with an even hand.
 
 
 57
 "The conduct of a fair trial is vested in the sound discretion of the trial judge," and on review his conduct "will be measured against a standard of fairness and impartiality." Cranberg v. Consumers Union of U.S., Inc., 756 F.2d 382, 391 (5th Cir.), reh'g denied, 763 F.2d 416, cert. denied, 474 U.S. 850, 106 S.Ct. 148, 88 L.Ed.2d 122, reh'g denied, 474 U.S. 1097, 106 S.Ct. 872, 88 L.Ed.2d 911 (1985). We address each of Chevron's allegations against this standard.
 
 
 58
 First, Chevron contends that the district court erroneously rejected its motion to limit the number of plaintiffs' attorneys permitted to question individual witnesses at trial. As a result, Chevron argues that counsel's repetitious questions placed unfair emphasis on the part of each witnesses' testimony that was favorable to plaintiffs. We find no abuse of the district judge's discretion in the manner he chose to control examination and cross examination of the witnesses by plaintiffs, who had substantially identical interests. Frequently, only one plaintiff's attorney questioned a defense witness on matters of common concern to all plaintiffs. Our review of the record persuades us that in those instances when the court permitted more than one plaintiff's attorney to question a witness on the same point this repetitious questioning was not so aggravated that Chevron was unfairly affected.
 
 
 59
 Next, Chevron argues that improper inflammatory comments by the trial court and opposing counsel adversely influenced the jury and requires a new trial. Specifically, Chevron objects to a remark by plaintiffs' counsel that Chevron violated the law and took "the law into their own hands," and references to a "deadly" crewboat and the plaintiffs' suffering and injuries. The record demonstrates, however, that the judge ruled on Chevron's contemporaneous objections, noting when counsels' remarks were improper. The district judge later denied Chevron's motion for a mistrial due to inflammatory remarks and "[t]he only question for us is whether the judge should have ordered a new trial because the damage done by [these] inflammatory [comments] was irreparable." Caldarera v. Eastern Airlines, Inc., 705 F.2d 778, 781 (5th Cir.1983). The denial of a motion for new trial "is reversible only for abuse of discretion." Id. Because the judge instructed the jury that opening statements and closing arguments were not evidence, fairly ruled on all parties' objections, and because "[a] trial judge is generally better able than an appellate court to evaluate the prejudice flowing from improper jury arguments," Id., we conclude that the district judge did not abuse his discretion in denying Chevron's motion for a new trial.
 
 
 60
 Chevron also complains that the trial judge permitted the plaintiffs' counsel to ask improper hypothetical questions that were not based upon facts in the record.[4] We also find this argument lacking in merit. Because the facts assumed by the experts had at least an arguable basis in the record, the district court did not err in permitting the questions.
 
 
 61
 Chevron also argues that it was reversible error for the trial judge to dismiss Freddie Collette, an adverse witness, before Chevron could cross-examine him. Chevron's counsel understood that the court ordered the trial to resume after the noon recess at 1:30; in fact, the trial was scheduled to resume at 1:15. When counsel did not appear at the appointed hour, the court dismissed the witness. Later, the judge permitted Chevron to recall Collette for cross-examination, but Chevron was unable to subpoena the witness. District courts "are entitled to manage their cases with the aim of conducting litigation efficiently." Carson v. Polley, 689 F.2d 562, 585 (5th Cir.1982). The trial judge did not abuse his discretion by dismissing Collette.
 
 
 62
 Chevron also challenges the fairness of the trial below on grounds that Judge Livaudais refused to award indemnity in favor of Chevron and against P & E for all sums Chevron was required to pay. Chevron admits, however, that "[i]n light of the liquidation of [P & E's insurer], this error is of no practical importance." Because the issue has no "practical importance," and the parties do not brief it, we express no opinion about the correctness of the court's ruling. This ruling certainly does not demonstrate that the district court was biased against Chevron.
 
 
 63
 Similarly, we find Chevron's allegation that the pretrial order provisions were enforced unevenly is without merit. Chevron points to two apparently inconsistent rulings on the admissibility of evidence not listed in the pretrial order. The judge excluded unlisted photographs taken of the Mississippi River, thirty minutes after the collision. The court, however, permitted Randolph Scarebien, who was not listed as a witness, to testify about Barry Hebert's conscious pain and suffering before he died. "Questions concerning ... the exclusion of undisclosed witnesses are reviewable only for abuse of discretion." Keyes v. Lauga, 635 F.2d 330, 335 (5th Cir.1981).
 
 
 64
 The photographs, which remained in Chevron's possession from the date of the accident until trial, were not disclosed to plaintiffs before trial. The court was entitled to conclude that the admission of this surprise evidence was manifestly unfair to plaintiffs who had inadequate time to respond to the evidence. Scarebien's testimony, in contrast, was no surprise to the defendant. Chevron knew that Scarebien pulled Hebert from the water after the collision. Chevron could easily have taken his deposition before trial. We conclude that neither the ruling excluding the photographs nor the ruling permitting Scarebien's testimony was an abuse of the district court's discretion.
 
 
 65
 Chevron's account of the various trial incidents described in their brief does not persuade us that the district court compromised the fairness and impartiality of this lengthy, complex trial.
 
 V. THE DENIAL OF PREJUDGMENT INTEREST
 
 66
 Finally, we consider plaintiffs' cross-appeal on the district court's denial of prejudgment interest. Under the general maritime law, an award of prejudgment interest is the rule rather than the exception. Reeled Tubing, Inc. v. M/V CHAD "G", 794 F.2d 1026, 1028 (5th Cir.1986). The trial court may, however, in its discretion deny such interest where the court finds "peculiar circumstances" that would render an award of interest inequitable. id. Peculiar circumstances justifying a denial of interest include instances where there is "a genuine dispute over a good faith claim ... in a mutual fault setting," and where "some equitable doctrine counsels against the award." id. Such a denial is reviewable under an "abuse of discretion" standard. Inland Oil and Transport Co. v. Ark-White Towing Co., 696 F.2d 321, 327 (5th Cir.1983). Here, the trial court listed six "peculiar circumstances":
 
 
 67
 1. After the early stages of discovery, when the parties realized that the respective owners of the two vessels involved in the collision had very little assets and inadequate insurance, the focus turned to the proverbial "deep pocket," Chevron, who also happened to be the time charterer of one of the vessels.
 
 
 68
 2. The issues of liability have been seriously and hotly contested by all parties from the very beginning.
 
 
 69
 3. Although Chevron was granted a partial summary judgment in the earlier stages of the case on the issues of vessel operational negligence and unseaworthiness, those very issues were indirectly presented to the jury at trial.
 
 
 70
 4. In the early stages of trial, the Court, on its own motion, bifurcated the issues of liability and damages, which had the practical effect of delaying the substantial amount of "medical" discovery needed to properly defend the myriad claims in this action. Then, on the plaintiffs' motion, and over defendant's objections, the court on February 28, 1986 consolidated the issues of damages and liability, which, naturally, necessitated a greater delay in choosing a new trial date in order that defendant could properly undertake the appropriate medical discovery.
 
 
 71
 5. The fact that the Governor of Louisiana was tried twice before this court, taking up approximately twenty-plus weeks of this court's trial docket, and thereby upsetting two separate trial dates for the case at bar (i.e., in the Fall of 1985 and in the Spring of 1986), was the quintessential "peculiar circumstance," which itself accounted for a substantial delay in bringing these claims to trial.
 
 
 72
 6. The parties will share a handsome punitive damage award.
 
 
 73
 Although we vacated the award of punitive damages, the remaining circumstances are sufficient to support the district court's decision to deny recovery of prejudgment interest.
 
 CONCLUSION
 
 74
 In summary, except for the award for lost earnings to Stoufflet, we affirm the district court's award of compensatory damages and denial of prejudgment interest. The district court will reconsider the award to Stoufflet on remand. We vacate the judgment against Chevron for punitive damages.
 
 
 75
 The judgment below is AFFIRMED in part, REVERSED in part and REMANDED for further proceedings consistent with this opinion.
 
 
 
 [1]
 Chevron, in a single conclusory sentence in its almost 100 page brief, complains of the district court's refusal to strike plaintiffs' jury trial against Stoufflet as operator and owner of the MISS BRIDGET. Assuming without deciding that this is sufficient to raise the issue on appeal, the district court made independent findings of fact on Stoufflet's liability and even if the court erred in submitting this issue to the jury, the error was harmless
 
 
 [2]
 Crewboat captain Dennis Johnson, an eight-year captain on vessels chartered to Chevron, testified that David Cooley, a Chevron assistant field foreman, called Johnson's supervisor and requested another boat when Captain Johnson refused to make a high speed run in the fog
 Crewboat operator Freddie Collette testified that Don Egli, a Chevron production foreman, ordered him to operate his crew boat across the Mississippi River in dense fog without the aid of a functional radar. The witness stated that Egli threatened to replace Collette if the captain refused to operate in the fog.
 Ellis Savoie, a ten-year captain with Chevron, testified that Joe Touchard, a Chevron engineer, fired him for refusing to run in heavy fog.
 Captain Vernon Bumgartner testified that Chevron arranged to have his employment terminated when he refused to comply with a field foreman's request that he stand by an offshore drilling platform with his utility vessel during Hurricane Juan.
 And Tom Popich, a boat owner who charters crew boats to oil companies in the Venice area, testified that, in the past, Chevron had asked him to replace boat captains who refused to run in the fog.
 
 
 [3]
 Section 909 permits recovery of punitive damages against a principal for the acts of an agent under the following conditions:
 (a) the principal or a managerial agent authorized the doing and the manner of the act, or
 (b) the agent was unfit and the principal or a managerial agent was reckless in employing or retaining him, or
 (c) the agent was employed in a managerial capacity and was acting in the scope of employment, or
 (d) the principal or a managerial agent of the principal ratified or approved the act.
 See also Protectus Alpha Navigation Co. v. North Pacific Grain Growers, 767 F.2d 1379 (9th Cir.1985).
 
 
 [4]
 For example, the plaintiffs' economist, Dr. McCoin, relied upon evidence of earnings of Shane Stockstill's successor to calculate Stockstill's future wage loss
 Similarly, Chevron contends that hypothetical questions based on the assumption that Chevron field foremen forced vessel operators to run in the fog were improper. But the testimony of Captains Johnson, Collette, Savoie and Barrios, arguably support this fact.